BATES FABRICS INC.

v.

PUBLIC UTILITIES COMMISSION.

Supreme Judicial Court of Maine.

Argued May 14, 1982.

Decided July 15, 1982.

Fitzgerald, Donovan & Conley, Mark L. Haley (orally), Constance P. O'Neil, Bath, Platz & Thompson, P. A., Philip Hargesheimer, Lewiston, for plaintiff.

Seward Brewster, Janee R. Shaw (orally), for Central Maine Power Co.

David Moskovitz (orally), Public Utilities Commission, Augusta, for defendant.

Before GODFREY, NICHOLS, ROBERTS, CARTER and VIOLETTE, JJ.

VIOLETTE, Justice.

Bates Fabrics, Inc. appeals pursuant to 35 M.R.S.A. § 303 (1978) and M.R.Civ.P. 73(b) from an order of the Public Utilities Commission denying Bates' "Petition ... to Determine ... Status as a Qualifying Small Power Producer and to Establish Rate for Purchase of Electricity." The Commission determined that under the Small Power Production Facilities and Cogeneration Facilities Act, 35 M.R.S.A. § 2321–2328 (Supp. 1981), [hereinafter referred to as the SPPFA] it did not have the authority to decide the dispute between Bates and Central Maine Power Company concerning the sale price of electricity by Bates to CMP where the parties had contractually agreed to a specified price. We deny the appeal and affirm the Commission's decision.

On June 1, 1977, Bates, CMP and Cumberland Securities Corp., a wholly owned subsidiary of CMP, entered into a contract which provided for the use and maintenance by Bates of various hydroelectric generating units owned by Cumberland. In addition, paragraph 2 of the contract detailed the financial relationship between Bates and CMP with respect to the hydroelectric units as follows:

Electricity from units not repaired or maintained by Bates but operated on behalf of CMP by Bates (hereinafter called "CMP Units") will be delivered to CMP and not used by Bates. Bates will assume operating and rack cleaning costs only for these units. CMP will pay Bates three mills per kilowatt hour generated on CMP units operated by Bates.

Any excess power generated on the Bates units above Bates' electric load will be delivered to CMP and paid for by CMP on a step-rate basis with the rate being three mills per kilowatt hour for the first 500,000 kilowatt hours delivered in each month and five mills per kilowatt hour for all kilowatt hours delivered in access [sic] of 500,000 kilowatt hours in each month. Said rates may be increased by mutual agreement of Bates and CMP to apportion extra costs imposed upon Bates by reason of non-routine repairs and maintenance and shorter amortization periods remaining under the term of this contract.

Within two years after the contract had been executed, federal and state legislation was enacted to encourage and, in some instances to regulate the purchase of hydroelectric electricity by public utilities from small power production facilities and cogeneration facilities. *See* 16 U.S.C. § 824a–3 (Supp.1982); 35 M.R.S.A. § 2321–2328 (Supp.1981). Pursuant to the pertinent enabling statute, known as the Public Utility

Regulatory Policies Act [hereinafter referred to as PURPA], the Federal Energy Regulatory Commission promulgated several rules to effectuate the purposes of the act, one of which states that purchases of electricity shall be at "just and reasonable" rates which are presumed to be the equivalent of the utility's "avoided costs." 18 CFR § 292.304(a)(1)(i) (1981). The Maine PUC has similarly provided that the "standard" rate of purchase "shall equal the purchasing utility's avoided energy costs." Me. Pub.Util. Comm'n Rules and Regulations, Chap. 36, § 4 B(3)(a).

On July 7, 1981, Bates petitioned the PUC, requesting that the Commission require CMP to pay an amount equal to avoided costs rather than the contract price for the electricity produced by Bates.[1] A hearing before a Commission Examiner was held on August 18, 1981. The Commission granted CMP's motion to dismiss the petition on September 30, 1981. The Commission ruled that the SPPFA authorized it to determine the purchase price of power only when the parties were "unable to mutually agree to a ... price for the electricity produced by the public utility." 35 M.R.S.A. § 2326. Since the contract between Bates and CMP fixed the purchase price, the PUC ruled that Bates could not seek its intervention in the dispute, and in effect indicated that Bates' complaint of unfair rates was simply not evidence of a lack of mutual agreement on a price.[2]

The Commission also rejected Bates' argument that agency jurisdiction could alternatively be premised on a paragraph of the private contract which stated:

In addition to the other provisions contained in this contract, the parties hereby reserve the right to modify or amend the contract at any time to comply with the ruling or decision of any authority or

---

1. CMP was named as a defendant. The Attorney General's motion to intervene was granted, but the office of the Attorney General has chosen not to file a brief in this appeal. Scott Paper Co. withdrew its petition to intervene.

2. Apparently, CMP also argued below that Bates was not a qualifying small power produc-

er or cogenerator and thus could not claim that the Act applied to the dealings between CMP and Bates. *See* 35 M.R.S.A. § 2323. The Commission declined to rule on this issue. Our disposition of this appeal renders unnecessary any consideration of Bates' status as a qualifying producer under the statutes.

agency of the Federal Government or the State of Maine having jurisdiction hereof, but this contract shall only be modified under the provisions of this paragraph as to such part as the ruling or decision of such authority or agency will require.

The PUC pointed out that the provision did not

demonstrate that the parties are not mutually agreed on the price of electricity. Section 6 [of the contract] does not provide a vehicle for one of the parties to the contract to *seek* the intervention of a governmental agency for the express purpose of modifying the contract. It merely provides a mechanism for handling orders by governmental agencies once an agency has ruled.

Following the issuance of the Commission's order, Bates petitioned the agency for a rehearing and reopening of its case. This petition was denied, and Bates has seasonably appealed to this court from the PUC order.

The question raised by its appeal is one of first impression in this jurisdiction which requires us to interpret the meaning and intent of the language of the SPPFA. Because Bates has also argued that the PURPA requires the Maine Public Utilities Commission to decide this case, we must also determine the import of the pertinent provisions of the federal regulatory scheme.

■ In 1978, Congress enacted the Public Utility Regulatory Policies Act (PURPA). Section 210 of the Act encourages the development of cogeneration and small power production facilities by authorizing the Federal Energy Regulatory Commission to set rates for the sale of electricity to electric utilities. The act provides in pertinent part:

(a) Cogeneration and small power production rules. Not later than 1 year after November 9, 1978, the Commission shall prescribe, and from time to time thereafter revise, such rules as it determines necessary to encourage cogeneration and small power production, and to encourage geothermal small power production facilities of not more than 80 megawatts capacity, which rules require electric utilities to offer to—

(1) sell electric energy to qualifying cogeneration facilities and qualifying small power production facilities and

(2) purchase electric energy from such facilities.

Such rules shall be prescribed, after consultation with representatives of Federal and State regulatory agencies having ratemaking authority for electric utilities, and after public notice and a reasonable opportunity for interested persons (including State and Federal agencies) to submit oral as well as written data, view, and arguments. . . .

16 U.S.C. § 824a–3(a). Under subsection f, the state regulatory authorities are required to implement the federally prescribed rules for each utility for which they have "ratemaking authority." *Id.* § 824a–3(f).

In November of 1979, the FERC promulgated several rules in accordance with section 210, only a few of which are relevant to this case. As Bates has noted, the rules do provide that the utility shall purchase electricity at a price equal to the utility's "avoided costs". 18 C.F.R. § 292.-304(a)(1)(i)(2). However, the rules further provide that:

§ 292.301 SCOPE

(a) *Applicability.* This subpart applies to the regulation of sales and purchases between qualifying facilities and electric utilities.

(b) *Negotiated rates or terms.* Nothing in this subpart:

(1) Limits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms, or conditions which would otherwise be required by this subpart;

(2) Affects the validity of any contract entered into between a qualifying facility and an electric utility for any purchase.

CMP argues that this rule demonstrates that the agency has construed the PURPA to mean that regulation is permissible only where the utility and small producer have not been able to agree to a rate. Bates contends that this language means simply that existing contracts remain valid until the Commission upon investigation determines that any provision is unjust, unreasonable or discriminatory.

We find support for the interpretation advanced by CMP in the following comment made by the FERC concerning the meaning of section 292.301(b)(2):

Some comments [submitted in response to the rule when proposed] stated that paragraph (b)(2) would unfairly penalize cogenerators and small power producers who, prior to the promulgation of these regulations, entered into binding contracts with electric utilities under less favorable terms than might be obtainable under these rules. The Commission interprets its mandate under section 210(a) to prescribe "such rules as it determines necessary to encourage cogeneration and small power production ..." to mean that the total costs to the utility and the rates to its other customers should not be greater than they would have been had the utility not made the purchase from the qualifying facility or qualifying facilities. *That a cogeneration or small power production facility entered into a binding contractual arrangement with an electric utility indicates that it is likely that sufficient incentive existed, and that the further encouragement provided by these rules was not necessary.* (emphasis added).

3. Section 51 provides:

§ 51. Safe facilities; just and reasonable rates

Every public utility is required to furnish safe, reasonable and adequate facilities. The rate, toll or charge, or any joint rate made, exacted, demanded or collected by any public utility for the conveyance or transportation of persons or property between points within this State, or for any heat, light, water or power produced, transmitted, delivered or furnished, or for any telephone or telegraph message conveyed, or for any service ren-

45 Fed.Reg. 12217–12218 (1980). We see no language in the statute, rules, or legislative history of section 210 of the PURPA which would suggest that Congress intended a state regulatory agency to have the authority to revise binding contractual provisions concerning the rate of purchase between a utility and a qualifying small facility. In fact, the agency has indicated that contracts executed prior to the enactment of the PURPA are not affected by the Act. We conclude that the federal scheme expressly excludes from its reach all otherwise binding contracts between utilities and cogenerators or small power producers, and that the Maine PUC therefore correctly determined that it had no Congressionally delegated authority to decide the issue presented by Bates. *See* 18 CFR § 292.-304(a)(2).

The absence of a federal mandate would not preclude the PUC from hearing this case if state law authorized the Commission to entertain Bates' complaint. Bates has argued that the PUC has jurisdiction over its petition under the agency's general regulatory powers enumerated in 35 M.R.S.A. § 51 (1978),[3] and that such power has not been "excepted in express terms or by necessary implication." *See Auburn Water District v. Pub. Util. Comm'n.*, 156 Me. 222, 163 A.2d 743 (1960); *In Re Searsport Water Co. and In Re Lincoln Water Co.*, 118 Me. 382, 108 A. 452 (1919). We do not reach the question of whether such authority can reasonably be found in any of the provisions of Title 35, since we hold that the SPPFA has excepted by necessary implication from regulation by the PUC all purchases of electricity by a public utility from a cogenerator or small

dered or to be rendered in connection with any public utility, shall be just and reasonable. In determining just and reasonable rates, the commission shall provide such revenues to the utility as may be required to perform its public service and to attract necessary capital or just and reasonable terms. Every unjust or unreasonable charge for such service is prohibited and declared unlawful. In determining just and reasonable rates, the commission may consider whether the utility is operating as efficiently as possible and is utilizing sound management practices.

power producer which are conducted pursuant to a binding contract which at some time was mutually agreed upon.

The Small Power Production Facilities Act was enacted in 1979. *See* 35 M.R.S.A. § 2321–2328 (Supp.1981). Although the state statutory scheme is more detailed than the federal scheme, many similar provisions exist. The purpose of the Maine Act, like that of the federal law, is to "encourage the development of energy producing systems using renewable resources . . . [and] to promote the more efficient use of existing energy systems particularly through the cogeneration of power." 35 M.R.S.A. § 2322. To this end, the legislature empowered the Public Utilities Commission to determine the rate and terms of purchases of electricity between the utility and facility. Section 2326 clearly states the scope of the Commission's authority:

> The rate paid by the public utility for the purchase of electricity as described in this section shall be determined by the small power producer or cogenerator and the public utility electric company or cooperative. In the event that the small power producer or cogenerator and the public utility electric company or cooperative are unable to agree to a contract for electricity, or to a price for the electricity purchased by the public utility, or to an equitable apportionment of existing transmission and distribution line improvement costs, the Commission shall require the utility to purchase the power at such rates and under such terms as the Commission shall establish.[4]

On its face section 2326 unquestionably restricts the Commission's role in electricity sales, and affirmatively states that the rate "shall" be determined by the parties. Only if one of three events occurs subsequent to the parties' attempts to negotiate a contract may the Commission exercise its regulatory powers.

We find that the legislative history of section 2326 and section 2324 of the SPPFA support this construction of the language of section 2326. The statement of fact which accompanied the original legislative document proposing the Act suggests that the drafters and, by passing the bill, the legislature did not intend to extend the jurisdiction of the PUC to situations such as that presented in this appeal:

> According to the provisions of this bill, a small power producer and a cogenerator *are not* public utilities subject to the jurisdiction *of the Public Utilities Commission, except that* the Commission *may review* and determine rates paid by a public utility to a small power producer or cogenerator *during a rate proceeding* before the Commission.

The "rate proceeding" to which the bill referred is a rate proceeding to determine the rate charged to the consumer by the utility, not the rate charged to the utility by the small producer.

The original language of section 2324 also supports the above interpretation of the Legislature's intent with respect to the PUC's jurisdiction to determine the purchase price of electricity by a public utility from a small producer. Section 2324 was enacted in 1979, as amended by a House bill,[5] as follows:

> Notwithstanding the definition of a public utility in section 15, subsection 13, a small power production facility and a cogeneration facility, as defined in section

---

**4.** Section 2326 was amended in 1981 to include the language "or to an equitable apportionment of existing transmission and distribution line improvement costs." P.L.1981 c. 450 § 7. The quoted part of the statute is identical in all other respects to the language of the original public law. *See* P.L.1979, C. 421 § 2.

**5.** In the original L.D. 1002, section 2324 stated that:

> A qualifying small power production facility and a cogeneration facility, as defined in

section 2323, shall not be a public utility for the purposes of this chapter. A qualifying small power production facility and a cogeneration facility shall not be subject to control or regulation by the Public Utilities Commission, except that commission determination and regulation of rates of public utilities which include purchases of power from a qualifying small power production facility or cogeneration facility shall not be considered control or regulation of these facilities.

2323, shall not be deemed a public utility and shall not be subject to control or regulation by the Public Utilities Commission, except that commission determination and regulation of rates of public utilities which include purchases of power from a qualifying small power production facility or cogeneration facility shall not be considered control or regulation of these facilities.

This section was amended in 1981 to permit the Commission to treat a utility's equity investment in a qualifying facility as utility property for retail ratemaking purposes. However, the original language remains nearly intact. The statute clearly embodies a Legislative determination that the PUC should not concern itself with the sales price of electricity sold by a qualifying facility to a public utility except to the extent specifically recognized by the provisions of the S.P.P.F.A.; in particular, section 2326, relating to inability to agree on a price.

We find no error in the Commission's decision that it lacked jurisdiction over Bates' complaint, and therefore affirm. The entry is:

Appeal denied.

Judgment affirmed.

All concurring.