# In re Vicon Recovery Systems

[572 A.2d 1355]

No. 88-008

Present: Allen, C.J., Peck and Morse, JJ., and Barney, C.J. (Ret.) and Connarn, D.J. (Ret.), Specially Assigned

Opinion Filed February 2, 1990

*Abell, Kenlan, Schwiebert & Hall,* Rutland, for Appellant Vicon Recovery Systems, Inc.

*Martin K. Miller* and *John B. Kassel* of *Miller, Eggleston & Rosenberg, Ltd.,* Burlington, for Appellant Rutland County Solid Waste District.

*James Volz,* Montpelier, for Appellant Department of Public Service.

*Morris L. Silver* and *Donald L. Rushford,* Rutland, for Appellee CVPS.

*Thomas J. Kennedy,* St. Albans, for Appellee VPIRG.

*David Dickinson,* pro se, Center Rutland, Appellee.

**Morse, J.** This case involves an electric power purchase agreement between Central Vermont Public Service Corporation and Vicon Recovery Systems, Inc. Seeking approval of the agreement, certain parties filed a joint motion with the Public Service Board. The Board denied the motion, and this appeal ensued. We affirm.

Appellants are Vicon, Rutland County Solid Waste District and the Department of Public Service. Vicon operated a facility in Rutland that generates electricity by burning trash, and the District regulates the disposal of solid waste in Rutland County. The Department of Public Service represents the public in matters before the Board. Appellees are Central Vermont Public Service Corporation, an electric utility, and Vermont Public Interest Research Group, Inc. (VPIRG).

The various claims of the parties center on the agreement between Central Vermont and Vicon. That agreement, known as a Power Purchase Agreement (PPA), initially called for Central Vermont to pay Vicon 12.02 cents per kilowatt-hour for electricity produced at its Rutland facility over twenty-six years. The PPA, entered into on December 20, 1984, was conditioned as follows:

> It is understood and agreed by the parties hereto that this Agreement is contingent upon the occurrence of the following events:

(1) Recognition by the Public Service Board, in Docket No. 4813 or otherwise, of VICON's eligibility for fully levelized, firm power rates as contemplated by the parties in negotiations with respect to this Agreement; and

. . . .

(3) The issuance of all necessary permits by the State of Vermont and its subdivisions, and approvals required of the Public Service Board, including approval under General Order 45 . . . .

Article XXXII ("Contingent Nature of Agreement").

The parties (with the exception of VPIRG) modified the agreement by stipulation in October of 1987, substituting a rate of 11.35 cents per kilowatt-hour and a term of thirty years. The stipulation included the provision that "[t]his stipulation is subject to Board approval in the form submitted, but each party reserves the right to withdraw from this stipulation if not approved as agreed by the parties."

On November 2, 1987, these parties filed a joint motion asking the Board to approve the PPA, as modified by the stipulation. The Board denied the motion by order dated December 18, 1987. The Board also denied a subsequent motion to reconsider, specifically disapproving both the original rate of 12.02 cents per kilowatt-hour over a twenty-six year term and the substituted rate of 11.35 cents per kilowatt-hour over a thirty-year term.

On appeal, appellants claim that federal law preempts state regulation of the contract here under consideration and that the Board consequently is without jurisdiction to approve or disapprove the rate agreed upon in the PPA. In addition, the Department argues that the Board does not have authority under state law to reject the contract rate, and the District maintains that the Board erred in failing to approve the rate on its merits.

Central Vermont did not respond to the above arguments, contending instead that the PPA never became an enforceable contract because a condition precedent—Board approval of the rate specified—was never satisfied. VPIRG urges both that the

Board has jurisdiction and that its decision to disapprove the contract rate was correct.

## I.

As a threshold matter, we observe that parties on both sides of this case seek too much on appeal. Appellants ask not only for a holding that the Board lacks jurisdiction, but also for a ruling that the PPA is consequently a valid, binding agreement.[1] Central Vermont requests a determination that the PPA is conditional on Board approval and that no contract exists because approval by the Board was not forthcoming. We believe, however, that the question of the PPA's viability is not properly before this Court.

We note that, in the course of the proceedings below, the Department filed a motion to dismiss on the ground that the PPA had already been subject to an investigative proceeding before the Board pursuant to a rule requiring notice of certain contracts for energy. General Order 45. This proceeding was "withdrawn" in March, 1987, without any action being taken by the Board. Arguing that "[t]here is simply nothing left for the Board to appropriately do," the Department implied that the PPA's contingencies had been satisfied. The Board never ruled directly on the motion to dismiss, although it did address certain of the underlying arguments in ruling on the parties' motion for approval.

On appeal, the Department seems to suggest that its motion to dismiss effectively places the issue of the contract's validity squarely before this Court. We disagree. First, while the motion included a collateral discussion of the PPA's contingencies, each argument raised was directed at the Board's rules, its powers and related policy considerations. Second, the Board never ruled on the contract's viability; even if it had

---

[1] Appellants are not in accord on the question of which version of the purchase agreement should be held binding. Vicon asks that the PPA, "as amended by the stipulation," should be declared enforceable, while the District and the Department maintain that the stipulation was not an amendment of the PPA but merely an unsuccessful attempt to settle the case. These parties, therefore, request a ruling that the PPA is binding on its original terms.

ruled on the motion to dismiss, resolution of this issue would not have been necessary. Finally, neither party to the PPA asked the Board to decide whether the agreement was binding, and the Department's standing to raise the claim is questionable. We conclude that the only matter properly before this Court is the Board's denial of the motion seeking approval of the PPA.

## II.

Appellants' preemption claim is predicated upon the federal Public Utility Regulatory Policies Act of 1978 (PURPA), which applies directly to the relationship between Vicon and Central Vermont. PURPA was enacted in 1978 "to combat the nationwide energy crisis." *FERC v. Mississippi*, 456 U.S. 742, 745 (1982). As the United States Supreme Court observed, one of PURPA's objectives is:

[T]o encourage the development of cogeneration and small power production facilities. Congress believed that increased use of these sources of energy would reduce the demand for traditional fossil fuels. But it also felt that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development.

*Id.* at 750–51 (footnotes omitted).

Under PURPA, Vicon is deemed a "small power producer" because it has a capacity of less than 80 megawatts and makes use of "biomass, waste, or renewable resources (such as wind, water, or solar energy)." 16 U.S.C. §§ 824a-3, 796(17)(A). As such, Vicon enjoys certain protections under federal regulations.

Charged with promulgating rules to effectuate PURPA's policies, the Federal Energy Regulatory Commission (FERC) implemented a regulatory scheme that "require[s] electric utilities to purchase electric power from . . . qualifying . . . small

power production facilities, and provide[s] for the exemption of qualifying facilities from certain federal and State regulation." Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12214 (1980). One of the key provisions of this scheme dictates the method by which rates paid to qualifying facilities by electric utilities must be calculated. See Regulations Under Sections 201 and 210 of the Public Utility Regulatory Policies Act of 1978 With Regard to Small Power Production and Cogeneration, 18 C.F.R. § 292.304 (1989).

The rate provisions of § 292 apply only where a small power producer chooses to invoke PURPA's requirements, i.e., in a situation where the electric utility is forced to purchase power from the small producer. The regulations make clear that utilities and qualifying facilities can *agree* to a rate different than would otherwise be mandated:

> *Negotiated rates or terms.* Nothing in this subpart:
>
> (1) Limits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or term or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be required by this subpart; or
>
> (2) Affects the validity of any contract entered into between a qualifying facility and an electric utility for any purchase.

18 C.F.R § 292.301(b). In other words, FERC specifically declines to regulate the rate in a PPA such as the one at issue here.

Appellants' preemption claim springs from the quoted regulation. Conceding the absence of expressly preemptive language, they argue nonetheless that the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Fidelity Federal Savings & Loan Ass'n v. Da La Cuesta*, 458 U.S. 141, 153 (1982). Hence, the argument goes, state authorities must also decline to regulate rates where they are voluntarily agreed to by electric utilities and qualifying facilities.

■ There is no question of Congress's power to preempt the states completely with respect to the regulation of transactions between utilities and small power producers. See *FERC v. Mississippi*, 456 U.S. at 759. The issue is whether PURPA represents "so pervasive" an exercise of Congressional power that a state is precluded from reviewing voluntary rate structures. We hold that it does not.

Our conclusion is based primarily upon the plain language of PURPA and FERC's interpretation of its own regulations. Although one of the primary legislative objectives underlying PURPA is to foster a favorable environment for small power producers, Congress did not mandate the creation of a zone in which utility activities would be completely unfettered by regulatory oversight. PURPA itself recognizes the existence of countervailing considerations: § 210(b)(1) of the Act directs that FERC's regulations, with respect to required purchases by public utilities, "shall be just and reasonable to the electric consumers of the electric utility and in the public interest . . . ." Public Utilities Regulatory Policies Act of 1978, § 210(b)(1), 16 U.S.C. § 824a-3(b)(1) (1988). In the context of required relationships between public utilities and small power producers, FERC's regulatory rate scheme presumably accomplishes this goal. Where voluntary power purchase contracts are involved, however, that rate scheme is inapplicable, and we believe that state regulatory oversight must therefore be contemplated.

FERC itself adopted this interpretation of PURPA and encouraged a corresponding application of its own regulations. In the course of a detailed analysis of § 292.301(b)(1), which exempts voluntary rate agreements from the accompanying rate regulations, FERC observed:

> Some commentators indicated that § 292.301(b)(1) might be interpreted as prohibiting a State from reviewing contracts for purchases. These commentators stated that, as a part of a State's regulation of electric utilities, a State regulatory authority needs to be able to review contracts entered into by electric utilities it regulates.
>
> These rules, and the exemptions being provided by these rules, are not intended to divest a State regulatory agency

of its authority under State law to review contracts for purchases as part of its regulation of electric utilities. Such authority may continue to be exercised if consistent with the terms, policies and practices under sections 210 and 201 of PURPA and this Commission's implementing regulations. If the authority or its exercise is in conflict with these sections of PURPA or the Commission's regulations thereunder, the State must yield to the Federal requirements.

Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12214, 12233 (1980); see also W. Golden, *The Role of State Regulatory Authorities in the Implementation of Federal Ratemaking Policies and Regulations for Small Hydroelectric Producers*, 16 New Eng. L. Rev. 711, 729 (1981) (although Congress apparently could preempt state ratemaking authority under PURPA, FERC's implementing regulations do not do so).

In support of its preemption claim, Vicon cites *Bates Fabrics Inc. v. Public Utilities Commission*, 447 A.2d 1211 (Me. 1982). There, a small power producer filed a petition with the state Public Utilities Commission, asking that body to revise a contract price that it had agreed to with a public utility prior to the enactment of PURPA. *Id.* at 1212. The Commission granted a motion to dismiss, citing jurisdictional grounds. *Id.* at 1212–13. On appeal, the petitioner argued that PURPA required the Commission to decide the case. The Supreme Judicial Court of Maine disagreed, stating:

> We see no language in the statute, rules, or legislative history of section 210 of the PURPA which would suggest that Congress intended a state regulatory agency to have the authority to revise binding contractual provisions concerning the rate of purchase between a utility and a qualifying small facility. . . . We conclude that the federal scheme expressly excludes from its reach all otherwise binding contracts between utilities and . . . small power producers, and that the Maine PUC therefore correctly determined that it had no Congressionally delegated authority to decide the issue presented by [the petitioner].

*Id.* at 1214. The court went on to note, however, that "[t]he absence of a federal mandate would not preclude the PUC from hearing this case if state law authorized the Commission to entertain [the petitioner's] complaint." *Id.* Thus, *Bates* directly contradicts appellants' proposition.

■ Because we find no conflict between the Board's exercise of its regulatory authority and either the provisions of PURPA or FERC's implementing regulations, we conclude that the Board's jurisdiction over this matter is not preempted by federal law.

## III.

■ The Department argues that, even absent preemption, the Board has no authority under Vermont law to give any opinion or make any decision about the rate or price in a PPA. To the contrary, 30 V.S.A. § 209(a)(8) could not confer jurisdiction on the Board more explicitly:

> [T]he board shall have jurisdiction to . . . make orders . . . in all matters respecting:
>
> . . . .
>
> (8) The sale to electric companies of electricity generated by facilities:
>
> (A) which produce electric energy solely by the use of . . . waste . . . ; and
>
> (B) which are owned by a person not primarily engaged in the generation or sale of electric power . . . ; and
>
> (C) which have a power production capacity . . . not greater than 80 megawatts.

*Id.* Here, the matter before the Board was a sale to Central Vermont of electricity generated by Vicon, a facility that meets the statutory criteria squarely. The Department's claim regarding state law is without merit.

## IV.

The District contends that the Board erred both in refusing to find that the agreed-upon rate was reasonable and in disapproving the agreement. The crux of the District's argument on

this point is the Board's insistence on judging the reasonableness of the PPA's rate term in light of current conditions rather than those existing in 1984.

In its opinion, the Board observed that:

> Ordinarily, the reasonableness and prudence of a utility's actions must be judged as of the time that the utility enters the transaction and on the basis of information available at the time. The utility's conduct cannot fairly be judged with the benefit of hindsight or on the basis of information that it did not have and could not reasonably be expected to have had. These principles would call for our judgment to be made on the basis of information available in December, 1984, when the contract was executed.

The Board then proceeded, nonetheless, to make its judgment on the basis of information available as of April, 1987, when the motion for approval was filed. The Board took this course for two reasons. First, although General Order 45 requires that power contracts be filed with the Board at least ninety days prior to execution, the Board was not asked to approve the PPA until three years after its execution. Thus, adherence to the "time of contract" rule would require the Board to consider a rate based on four-year-old economic conditions. As the Board stated:

> To permit utilities to enter into agreements that call for Board approval of their terms, and yet allow the approval process to be delayed for years when there is no necessity whatever for delay, both invites manipulative conduct by the contracting parties and casts doubt upon the integrity of the Board's processes.

The Board's second reason for declining to apply the time of contract rule in this situation involved the PPA itself:

> [A]lthough certain incidental provisions of the PPA became effective as of the time of execution, the essential commitments of the parties—Vicon's to sell power and CVPSC's to buy it at a certain rate—were not effective at that time. They became effective, as provided by [the PPA], only upon occurrence of certain contingencies, one of those

being "approval [by the Public Service Board] under General Order 45." In other words, the essential commitment, the one with respect to which the Board is obliged to assure just and reasonable rates to ratepayers and to protect against destabilizing financial burdens falling upon the utility, was not undertaken upon the execution of the contract. It is undertaken upon Board approval under General Order 45, and that is the time, under the principle espoused by the proponents themselves, as of which costs must be examined.[2]

Because of this aspect of the agreement, therefore, the Board considered its analysis to be logically consistent with the time of contract rule.

The District argues that, in refusing to apply the time of contract rule in this case, the Board was effectively engaging in administrative rule-making. Noting that formal rule-making procedures were not followed, the District maintains that the Board committed reversible error.

The United States Supreme Court considered a similar argument in *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). *Chenery* involved a Securities and Exchange Commission order that restricted securities trading by the management of a public utility holding company in the process of reorganization. The order was appealed on the theory that the SEC's adjudicatory decision had announced a new standard of conduct and applied it retroactively. The Supreme Court rejected this contention, stating that:

> Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of ac-

---

[2] To avoid "unbreakable circularity in process," the Board examined the reasonableness of the rate as of the time approval was sought.

tion to the exclusion of the other is to exalt form over necessity.

. . . .

. . . [W]e refuse to say that the Commission, which had not previously been confronted with the problem of management trading during reorganization, was forbidden from utilizing this particular proceeding for announcing and applying a new standard of conduct. That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.

*Id.* at 202–03 (citations omitted); see also *McHenry v. Bond*, 668 F.2d 1185, 1192 (11th Cir. 1982) ("Agencies commonly use adjudicative proceedings to formulate standards and policies.").

■ Here, the Board, like the SEC in *Chenery*, was confronted with a novel situation: a request for approval of a three-year-old agreement reflecting then-existing economic conditions. The Board acknowledged that the time of contract rule is based on equitable principles, but it also recognized its statutory duty to protect the public interest. We are not prepared to hold that, in striking the balance here, the Board abused its discretion by refusing to apply a general rule to an exceptional set of circumstances.

*Affirmed.*