# White Current Corporation v. Vermont Electric Cooperative, Inc. and Vermont Electric Generation and Transmission Cooperative, Inc., et al.

[609 A.2d 222]

No. 90-083

Present: **Allen, C.J., Gibson, Dooley and Morse, JJ., and Martin, Supr. J., Specially Assigned**

Opinion Filed January 31, 1992

Motion for Reargument Denied March 30, 1992

*William J. Donahue*, White River Junction, and *Roger Lamson*, Hartland, for Plaintiff-Appellee.

*Michael L. Burak, David M. Hyman* and *Andrew H. Montroll* of *Burak & Anderson*, Burlington, for Defendants-Appellants.

**Allen, C.J.** This interlocutory appeal focuses on a letter of intent executed by appellant electric cooperatives (Vermont Electric Cooperative, Inc. and its subsidiary Vermont Electric Generation and Transmission Cooperative, Inc.) and appellee White Current, Inc., a small power producer. During the liability phase of a bifurcated trial, the jury found that the letter constituted a binding contract for the purchase of electrical energy which the cooperatives breached. The court entered a partial final judgment for White Current.

After the court denied their motion for judgment notwithstanding the verdict, the cooperatives filed a motion pursuant to V.R.A.P. 5(b) for leave to file an interlocutory appeal. The court granted the motion and certified the following questions:

> (1) Whether failure of all or any party to Exhibit No. 4 [the letter of intent] to submit to the Public Service Board for approval, as required by General Order 45, an agreement contemplating the purchase and sale of electricity produced by a hydroelectric facility in Vermont rendered the agreement unenforceable.

> (2) Considering the evidence in the light most favorable to the Defendants, whether there was any evidence to fairly and reasonably support the jury's special verdict that the power sale agreement embodied in Exhibit No. 4 was subsequently orally modified.

(3) If the answer to Question No. 2 is affirmative, whether subsequent oral modification of Exhibit No. 4 would render Exhibit No. 4 unenforceable as contrary to the Statute of Frauds.

The trial court found that these were controlling questions of law on which there were substantial grounds for difference of opinion and that their resolution would materially advance the termination of the litigation. We answer the first two questions in the negative, do not reach the third, and remand the case for a trial on damages.

The trial court opined that the interests of judicial economy would be well served if the Supreme Court considered all appealable issues related to the partial judgment. At the cooperatives' request, the court certified an additional eighteen questions without making any findings that they were controlling, substantial or would advance the litigation.

The cooperatives raise four main issues in their brief: (1) whether the trial court properly submitted the letter of intent to the jury to determine whether it was a binding contract, (2) whether the court properly excluded expert testimony, (3) whether White Current's failure to file the letter with the Vermont Public Service Board rendered it unenforceable, and (4) whether the trial court properly considered the issue of oral modification of the letter. The first two were not properly certified by the trial court, and we decline to address the first for reasons stated herein. We consider the second because it was contested below and properly preserved. We consider the cooperatives' third and fourth arguments, but decline to adopt their formulation of the oral modification issue and address that issue as certified by the trial court.

## FACTS

White Current, a qualifying small power producer under federal law, began to develop a hydroelectric site on the Ottauquechee River in Hartland in the late 1970s. Soon after White Current commenced this project, the cooperatives started their own larger project one mile upstream. Fearing the effects of proposed stream impoundments that would result from construction at the cooperatives' site, White Current indicated its intention to intervene in related regulatory proceedings. Con-

cerned with delays that might result from such intervention, the cooperatives prepared the letter of intent which was executed by the parties.

The letter provided that the parties enter into a power sales agreement, after obtaining the necessary regulatory approvals, according to "essential terms" set forth in the letter. The terms specified that White Current would sell, for an initial period of ten years, the net output of its planned 432-kilowatt generator to the cooperatives at a price equal to 85% of the cooperatives' generation costs at their upstream project. The letter contained specific price terms for the period before the cooperatives' project was to become operative. In the final paragraph of the letter, the parties agreed to resolve any disputes concerning the impact of the cooperatives' project on White Current's ability to generate power exclusively through the Federal Energy Regulatory Commission (FERC). The letter was not filed with the Public Service Board (PSB) pursuant to its General Order 45, which requires utilities to file all contracts, including letters of intent, for the purchase or sale of electrical energy.

One impact of the cooperatives' project was to cause intermittent increases in stream flow, which White Current's planned 432-kilowatt generator could not accommodate. White Current therefore modified its original plan and installed a second, larger generator designed to meet this new condition. Roger Lamson, White Current's principal, testified at trial that the cooperatives agreed to purchase the output from that generator as well, but that the agreement was never reduced to writing. With both generators on line, White Current operates at approximately 2000 kilowatts and the project is now leased to a third party.

After the parties signed the letter of intent, White Current intervened in the cooperatives' FERC proceedings out of continuing concern for stream flow coordination between the two projects. Because of this intervention, the cooperatives refused to execute a formal power sales agreement or purchase any power generated by White Current. White Current then sued the cooperatives for breach of contract.

One week before the trial on liability, the cooperatives announced their intention to call expert witnesses to testify about the custom and usage of letters of intent in the utility industry.

They did not identify the experts until a few days before trial and did not file notice with the court until the eve of trial. The trial court excluded this testimony. At the request of the parties, the court submitted written interrogatories to the jury on the issue of whether the letter of intent was a binding contract for the purchase of output from the 432-kilowatt generator. The jury found that the letter represented a binding agreement which the cooperatives had breached. While the jury deliberated, the parties agreed to submit additional interrogatories to the jury on whether the contract had been modified or whether the parties entered into a separate oral agreement for power from the second larger generator. Counsel did not present argument on this issue, and the court submitted it to the jury without significant instruction. The jury found an oral modification. After reviewing the testimony, the court ruled that there was no evidence to support this finding and entered a partial final judgment for White Current on all questions of liability concerning the 432-kilowatt generator.

I.

Initially, we address the matter of questions and issues not properly certified for review pursuant to V.R.A.P. 5(b). We do not agree with the trial court's observation that judicial economy would be well served if we were to consider all appealable issues at this time. As we have earlier noted:

> Interlocutory appeals are an exception to the normal restriction of appellate jurisdiction to the review of final judgments. There are weighty considerations that support the finality requirement. Piecemeal appellate review causes unnecessary delay and expense, and wastes scarce judicial resources.

*In re Pyramid Co.*, 141 Vt. 294, 300, 449 A.2d 915, 918 (1982). We have also recognized that although the criteria of V.R.A.P. 5(b) are flexible and do not draw bright lines, neither do they give the judiciary "license to abuse the interlocutory appeal mechanism." *Id.* at 301–02, 449 A.2d at 919. As a general rule, "failure to satisfy any one of the V.R.A.P. 5(b) criteria . . . precludes certification and appellate decision." *Id.* at 302, 449 A.2d at 919.

This Court has, on occasion, deviated from the general rule and decided issues on interlocutory appeal where the trial court had not properly certified the question but where the question is capable of resolution and has been fully briefed and argued. See *Derosia v. Book Press, Inc.*, 148 Vt. 217, 218, 531 A.2d 905, 906 (1987). We will also, on occasion, reach issues fairly raised by the order appealed from. See *State v. Dreibelbis*, 147 Vt. 98, 100, 511 A.2d 307, 308 (1986). We decline, however, to entertain an issue neither presented by properly certified questions nor otherwise raised by the proceedings below or the order appealed from.

 The first issue raised by the cooperatives falls into this category. They argue that the trial court erred by allowing the jury to construe the letter of intent without first finding that the letter was ambiguous as a matter of law. This issue is not presented by the questions certified for review upon which the trial court made appropriate findings warranting interlocutory review. Nor is it found in the additional questions, upon which no findings were made. The question was not raised in the cooperatives' motion for judgment notwithstanding the verdict and was not addressed in the opinion and order of the court denying that motion. Because the question was not properly certified and not otherwise raised by the proceedings below, we decline to address it in this appeal.

## II.

The cooperatives' second point is that the trial court improperly excluded expert testimony on custom and usage in the utility industry.[1] The cooperatives maintain that the court abused its discretion when it excluded this testimony as a discovery sanction and on relevancy grounds. We find no abuse of discretion here.

 Parties are required to respond to discovery requests concerning the identity of experts expected to be called as witnesses at trial. V.R.C.P. 26(b)(4)(A)(i). Such responses must be seasonably supplemented to include after-acquired information

---

[1] We address this question, also not properly certified by the trial court, because, unlike the first question, it was fairly raised by the proceedings below. The issue was contested at trial and properly preserved.

concerning the identity of experts. V.R.C.P. 26(e)(1)(B). Although V.R.C.P. 37, governing sanctions for discovery abuses, does not specifically address a party's failure to seasonably supplement discovery, the trial court has inherent authority to enforce V.R.C.P. 26(e) by excluding evidence, granting a continuance, or by taking other appropriate action. *Grimes v. Haslett*, 641 P.2d 813, 822 (Alaska 1982) (citing 8 C. Wright & A. Miller, Federal Practice and Procedure § 2050, at 325 (1970)). Absent an abuse of discretion, the trial court's use of sanctions respecting Rule 26(e) will be upheld. *Id.* at 822. To support their claim of abuse of discretion, the cooperatives must show that the trial "court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable." *State v. Dorn*, 145 Vt. 606, 616, 496 A.2d 451, 457 (1985).

The court did not abuse its discretion here. The cooperatives received interrogatories seeking discovery of expert witnesses over one and one-half years prior to trial, yet failed to disclose their intention to present experts on custom and usage until a week before trial. The experts' identities were disclosed in supplemental answers to interrogatories dated three and six days prior to trial but not filed with the court until the day before trial. It was reasonable for the court to find the cooperatives' disclosure not seasonable and exclude their witnesses' testimony. To permit the witnesses to testify would frustrate the primary purpose of liberal civil discovery rules: the prevention of surprise to one's opponent. *Davis v. Marathon Oil Co.*, 528 F.2d 395, 403 (6th Cir. 1975), *cert. denied*, 429 U.S. 823 (1976). Given the length of time available to the cooperatives to prepare for trial, we can find no abuse of discretion in excluding experts who were disclosed at the last minute.

The cooperatives argue that the trial court's exclusion of their expert witnesses was partially based on a ruling that such testimony would be irrelevant. The exclusion, however, was fully justified as a discovery sanction and does not depend on the relevancy ruling. Any prejudice to the cooperatives resulted from their own failure to identify their expert witnesses at an earlier time. Furthermore, the cooperatives used in-house experts to testify regarding the use of letters of intent in the utility industry, minimizing potential prejudice.

## III.

The first certified question asks whether the failure of any party to file the letter of intent with the PSB pursuant to General Order 45 rendered the agreement unenforceable. The cooperatives maintain that by failing to file, White Current deprived the PSB and the cooperatives' ratepayers of important regulatory review. While we agree that General Order 45 provides the PSB with an important planning and review mechanism, the responsibility for filing fell to the cooperatives, not White Current. The cooperatives failed to fulfill this responsibility and may not assert that failure as a basis for relief on appeal. We therefore answer the first question in the negative.

General Order 45,[2] promulgated by the PSB in 1965, requires utilities to file contracts, including letters of intent, for the purchase or sale of electrical energy. In its opinion issued in support of the order, the PSB wrote that it sought to avoid "pockets of [power] poverty," to encourage efficient and economical generation and transmission, to coordinate the planning for new facilities, and to reserve the opportunity to counsel modification of proposed contracts. *Public Service Board Opinion* (September 29, 1965). Filing pursuant to General Order 45 triggers the broad authority and jurisdiction of the PSB conferred by 30 V.S.A. § 209. Significantly, General Order 45 contains no penalty provision for failure to follow its provisions and does not state that an unfiled contract or letter of intent is without

---

[2] The order states, in pertinent part:
IT IS HEREBY ORDERED THAT:
1. Each private, municipal, and cooperative utility is requested and required to give the Public Service Board notice in writing, at least ninety (90) days in advance . . . of any of the following events:

. . . .

e. the execution of any contract for the purchase of capacity in, or energy from, any electrical generation or transmission facility for ultimate consumption within the State of Vermont;
f. the execution of any contract for the sale of capacity in, or energy from, any electrical generation or transmission facility located within the State of Vermont.

. . . .

4. For the purpose of this General Order, a letter of intent signed by or on behalf of two or more parties is deemed to be contractual commitment.

validity. Enforcement of General Order 45 occurs through 30 V.S.A. § 247, which provides for a $100 fine or 60 days imprisonment, or both, for the violation of "any order, rule or regulation" adopted by the PSB.

White Current's argument that federal law preempts General Order 45 is without merit. In *In re Vicon Recovery Systems*, 153 Vt. 539, 543–47, 572 A.2d 1355, 1357–59 (1990), we directly held that the Public Utility Regulatory Act of 1978 (PURPA) does not preempt the PSB's authority to regulate contracts between utilities and small power producers. In support of its argument, White Current points to 18 C.F.R. § 292.602(c)(1), which exempts small power producers from "State law or regulation respecting: (i) [t]he rates of electric utilities; and (ii) [t]he financial and organizational regulation of electric utilities." This exemption, taken almost verbatim from PURPA,[3] flows from Congress's belief that state and federal regulation of alternative energy sources "imposed financial burdens upon the nontraditional facilities and thus discouraged their development." *Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 751 (1982).

■ This exemption, however, does not eliminate the requirement that the letter be filed with the PSB pursuant to General Order 45, which does not directly regulate the rates, finances or organization of utilities. The primary function of the order is to facilitate the planning and coordination of the use of electricity in Vermont. Furthermore, when promulgating § 292.602, FERC explained that "[t]hese rules, and the exemptions being provided by these rules, are not intended to divest a State regulatory agency of its authority under State law to review contracts for purchases as part of its regulation of electric utilities." 45 Fed. Reg. 12233 (1980), quoted in *Vicon*, 153 Vt. at 545–46, 572 A.2d at 1359. Without authority to review such contracts, Vermont would have no means of ensuring compliance with PURPA or giving effect to FERC's regulations. Additionally, the PSB's commitment to comprehensive statewide planning and coordination would be undermined by the exemption of contracts for the sale of power between small power pro-

---

[3] 16 U.S.C. § 824a-3(e)(1).

ducers and electric utilities.[4] For these reasons, we hold that the letter of intent should have been filed with the PSB as required by General Order 45.

■ We conclude that the cooperatives, not White Current, had responsibility for filing the letter of intent with the PSB. That letter states that "VEG&T shall obtain all necessary regulatory and other approvals to execute the power sales agreement." Furthermore, General Order 45 expressly requires filing by "[e]ach private, municipal, and cooperative *utility*." (Emphasis added.) This language places the responsibility for filing the letter on the cooperatives, rather than on White Current, which is a small power producer, not a utility. We base our conclusion that White Current is not a utility on the PURPA scheme and the definition of public utilities found in the case law.

PURPA treats small power producers in a manner that clearly distinguishes them from utilities. PURPA relies on the definition of "small power production facility" found in the Federal Power Act. 16 U.S.C. § 824a-3(j). That Act defines a small power producer as a facility which "produces electric energy solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources, or any combination thereof" and "has a . . . capacity . . . not greater than 80 megawatts." 16 U.S.C. § 796(17)(A). Once recognized, these facilities enjoy exemption from extensive federal and state utility regulation. 16 U.S.C. § 824a-3(e)(3). Significantly, PURPA expressly precludes the sale of power by a small power producer to the public. All sales by such facilities, unlike utilities, must be for resale. 16 U.S.C. § 824a-3(a). As Congress enacted PURPA, it recognized that

> small power producers are different from electric utilities, not being guaranteed a rate of return on their activities generally or on their activities vis a vis the sale of power to the utility and whose risk in proceeding forward in the cogeneration or small power production enterprise is not guaranteed to be recoverable. H.R.Conf.Rep. No. 95-1750,

---

[4] The PSB has, since the inception of this controversy, resolved all doubt on this issue. Rule 4.102(B), originally adopted in 1983, specifically requires the filing of these contracts pursuant to General Order 45.

pp. 97–98, U.S. Code Cong. & Admin. News, pp. 7831–7832 (1978).

Both the plain language of PURPA and Congressional intent support our conclusion that White Current is not a utility.

FERC regulations, promulgated to implement PURPA by providing detailed mechanisms requiring the purchase of alternative energy, continue the distinction between utilities and small power producers. 18 C.F.R. §§ 292.101–292.602 (1991). In its summary published with the regulations, FERC wrote that a "small power producer which provided electricity to a utility's grid ran the risk of being considered an electric utility and thus being subject to State and Federal regulation as an electric utility." 45 Fed. Reg. 12215 (February 25, 1980). This statement underscores the federal government's intention to differentiate small power producers from utilities.

Case law from other jurisdictions supports our conclusion that White Current is not a utility. The distinguishing characteristic of a utility is its duty to serve the public without discrimination. See *City of Phoenix v. Kasun*, 54 Ariz. 470, 475, 97 P.2d 210, 212 (1939) (distinguishing characteristic of public utility is devotion of private property to efficient public use at proper rates); *In re Wind Power Pacific Investors—III*, 67 Haw. 342, 345, 686 P.2d 831, 833–34 (1984) ("The term 'public utility' implies a public use," the regulation of which ensures efficient, nondiscriminatory service to public at fair rates.); *Peoples Energy Corp. v. Illinois Commerce Commission*, 142 Ill. App. 3d. 917, 930, 492 N.E.2d 551, 561–62 (1986) (mere sale of electricity does not render seller a utility; public utility implies public use and duty to serve the public without discrimination); *Marano v. Gibbs*, 45 Ohio St. 3d 310, 311, 544 N.E.2d 635, 637 (1989) (public utility characterized by public concern). The Alabama Supreme Court has recognized that "not all purveyors of energy commodities are 'public utilities,' even though they sell and distribute their products under statutory regulation." *Coastal States Gas Transmission Co. v. Alabama Public Service Commission*, 524 So. 2d 357, 360 (Ala. 1988). White Current does not have a duty to serve the public. As a small power producer, it sells its product in bulk to one purchaser. It is the purchaser that is bound to provide indiscriminate service to the public at proper rates. The cooperative utilities, therefore, and

not White Current, were responsible for filing the letter of intent pursuant to General Order 45.

■ ■ The cooperatives' failure to file the letter of intent with the PSB precludes them from now offering that failure as the basis for invalidating an otherwise enforceable agreement. "[N]o [party] may take advantage of [its] own wrong." *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232 (1959). Had the cooperatives met their regulatory duty by filing the letter, the defect upon which they now rely would not exist. They may not avoid their obligations to White Current based on their own failure to comply with General Order 45. The failure of either party to file the letter of intent with the PSB did not render that letter unenforceable.

Our determination that White Current had no responsibility for filing the letter of intent does not, as the cooperatives argue, impair the PSB's ability to review contracts entered into by small power producers. Because PURPA requires that all such contracts be for the resale of electricity,[5] the other party will always be a utility, which will distribute the purchased power to the public. Utilities have filing responsibility pursuant to General Order 45 and, through their compliance, all contracts involving small power producers in Vermont should continue to meet with PSB review.

The cooperatives' argument that the filing obligation was necessary in this case to protect ratepayers merits little discussion. We can find no evidence that ratepayers needed protection here. Indeed, the price at which the cooperatives agreed to purchase White Current's output was only eighty-five percent of their upstream generation costs. The cooperatives rest their argument on technical noncompliance with General Order 45 without suggesting that their agreement with White Current was against the ratepayers' interests. This technical violation, that neither impacts the dispute between the parties nor contravenes public policy, cannot be used by the cooperatives to avoid their contractual obligations. See *MacDonald v. Roderick*, 158 Vt. 1, 7, 603 A.2d 369, 371–72 (1992) (mere technical violation of Real Estate Commission rules, that neither

---

[5] 16 U.S.C. § 824a-3(a)(2).

tainted agreement nor made enforcement unfair, did not render otherwise valid broker's agreement unenforceable).

## IV.

The second certified question asks whether, considering the evidence in the light most favorable to the cooperatives, there was any reasonable support for the jury's finding of oral modification of the agreement embodied in the letter.[6] We find no support for the jury's finding and therefore answer this question in the negative.

Although the letter of intent refers to the "net electrical output" of White Current's project, it makes clear that the project referred to is the 432-kilowatt generator. The cooperatives argue that a draft power sales agreement, circulated by Lamson on behalf of White Current, is evidence of the parties' intention to contract for the project's entire output. The parties, however, never executed that document. Furthermore, Lamson's testimony all pointed to a separate, oral agreement concerning the second generator. He discussed two distinct "problems," referring to the first and second machines. He clearly indicated that the cooperatives wanted a separate agreement on the second machine, but were unwilling to commit that agreement to writing at the time they executed the letter of intent. There is some evidence that the parties orally agreed that the cooperatives would ultimately purchase the output from the second generator, but we find no evidence to support the cooperatives' contention that such agreement in any way modified the agreement on the first generator.

The trial court did not err, as the cooperatives contend, by rejecting the jury's finding of oral modification, because the issue could be resolved as a matter of law. See *McLaughlin v. Fellows Gear Shaper Co.*, 786 F.2d 592, 599 (3d Cir. 1986) (trial court properly set aside jury finding of assumption of risk as contrary to the evidence); *Bethlehem Fabricators, Inc. v. Brit-*

---

[6] We decline to consider this issue as reformulated by the cooperatives. It is within the discretion of the trial court to state the controlling question, and we will not review or rephrase the issue unless clear error is shown. *Brown v. Tatro*, 134 Vt. 248, 249–50, 356 A.2d 512, 513 (1976).

*ish Overseas Airways Corp.*, 434 F.2d 840, 843 n.2 (2d Cir. 1970) (a court may disregard jury answers to questions that can be resolved as a matter of law); *Tedrowe v. Burlington Northern, Inc.*, 158 Ill. App. 3d 438, 444, 511 N.E.2d 798, 802 (1987) (trial court may disregard jury answer that is "contrary to the manifest weight of the evidence").

Because we answer the second certified question in the negative, we do not reach the third.

*The first two certified questions are answered in the negative. Cause remanded.*