587 A.2d 966 (1991)
In re D.B.
Nos. 88-413, 90-320.
Supreme Court of Vermont.
January 11, 1991.
*967 Dale Gray, Caledonia County State's Atty., St. Johnsbury, and Gary Kessler and Rosemary Hull, Dept. of State's Attys., Montpelier, for plaintiff-appellee.
Michael Rose, St. Albans, for defendant-appellant.
Before ALLEN, C.J., and PECK, GIBSON and DOOLEY, JJ.
ALLEN, Chief Justice.
The mother of a child declared to be in need of care or supervision (CHINS) under 33 V.S.A. § 632(a)(12)(C) (current version at 33 V.S.A. § 5502(a)(12)(C)) by the Caledonia District Court, sitting as a juvenile court, appeals on grounds that the allegations in the CHINS petition were not sustained, that the child's guardian ad litem did not adequately fulfill his responsibilities and gave unsworn opinion evidence without being subject to cross-examination, and that the disposition order was not supported by the evidence. We affirm.
On October 30, 1987, the State filed a CHINS petition, alleging as grounds the 11-year-old child's truancy from his fifth grade public school during a two-month period. At a merits hearing held on January 4, 1988, the juvenile court found that D.B. admitted the truancy after he had been advised that he was not charged with a crime. The mother opposed the CHINS petition and sought to explain the reasons for her son's absences from school. The judge found her explanation inadequate, and entered an order granting the petition. The court, however, in rendering its decision, found the State had proven "delinquency" instead of CHINS. No party moved to correct the mistake, and the matter was set down for a disposition hearing.
The dispositional phase of the case extended over three hearing dates. On March 10, 1988, the principal of D.B.'s school testified that D.B. had attended only 24 of 110 school days in the 1987-88 school year. He did have a good attendance record while living with another family in November 1988, but truant behavior resumed when he returned home to live. Attempts were made to have other children accompany D.B. to school, and the school adopted a plan to have him attend on a half-day schedule. The principal testified that D.B.'s attitude was positive while at school, but that he was negative while at home, where the principal went on two occasions to bring him to school.
D.B.'s SRS case worker testified that she had attempted to encourage D.B. to go to school and that in her opinion if D.B. were left in his mother's custody, he would not attend school regularly. She stated that it was in D.B.'s best interest to live outside of his mother's home.
The court requested that SRS look into further funding for the other family, so that D.B. might live with them but remain in his mother's custody. D.B.'s guardian ad litem stated that placement with this family was a possible alternative.
The disposition hearing reconvened on March 24, 1988, and the guardian ad litem advised the court that the other family did not want to become licensed foster parents and, therefore, their home could not serve as an alternative residence for D.B..
Dr. Robert Belenky, a psychologist who had counseled D.B. and was familiar with other family members, testified about the reasons for D.B.'s truancy, which he related to the dysfunctional nature of the family. Specific family problems included violent acts by a male friend of D.B.'s mother at the family's house, violent acts by D.B. against an older sister, the mother's unwillingness to accept responsibility for dealing with her son's problems, and her unwillingness or inability to cooperate with school authorities and SRS to address the problems of D.B.'s school attendance and related behavioral difficulties. Referring to D.B.'s violence, Dr. Belenky testified that *968 "what concerns me is the combination of absenting himself and blind force, so one of my concerns is when this guy gets to be 16, with that kind of background, he's going to be very poorly educated and very prone to delinquency. Really dangerous delinquency." Dr. Belenky testified that D.B. would not be likely to attend school if he remained with his mother and recommended that he be placed in SRS's custody, with placement in a residential school.
The final disposition hearing was held on May 19, 1988, at which time the State informed the court that D.B.'s mother had moved into a new school district. The State's position at this hearing was that the family's frequent moveseight in the previous seven and one-half yearshad allowed the mother to avoid a solution to D.B.'s problems. There was a lengthy discussion in open court of alternative placement possibilities for D.B. that would allow him to remain in the mother's custody, but under protective supervision. Both D.B.'s case worker and guardian ad litem opposed those alternatives, arguing that both the mother and D.B. had long avoided addressing the root causes of the truancy and that maintaining custody with the mother would further delay any effective changes in D.B.'s life. The court interviewed D.B. on the record in chambers, but could glean no explanation for his truancy. During this interview the child stated that he wanted his guardian ad litem dismissed.
Upon completion of the third disposition hearing, the court issued findings and an order transferring D.B.'s custody to SRS. An appeal followed to this Court. After the mother's brief was filed raising the issue of the juvenile court's January 4, 1988 misstatement of delinquency, the State moved under V.R.A.P. 10(e) for modification of the trial record to reflect a CHINS, rather than a delinquency, finding. We granted that motion, and on May 10, 1990, the trial court filed an order amending the record to reflect a finding of CHINS. D.B.'s mother again appealed, preserving the issues in the first appeal and taking exception to the trial court's order on remand under V.R.A.P. 10(e). The two appeals were consolidated and are considered here together.
On appeal D.B.'s mother faults the trial court twice for its initial misstatement that D.B.'s "delinquency" had been proven. The mother argues, first, that because of the mistake, the CHINS allegations were never proven, and second, that the trial court failed to follow this Court's directions after our remand pursuant to V.R.A.P. 10(e). We need not address the second argument, as our rejection of the first argument renders academic the issue of whether the trial court followed our mandate under Rule 10(e).
The petition and the transcript make clear that the matter involved truancy, not delinquency,[*] and had been pursued in all stages as a CHINS case. The reference to "delinquency" at the merits hearing did not reflect a broad pattern of misunderstanding, as suggested by the mother. The CHINS finding was consistent with the evidence; D.B. admitted the truancy which lay at the heart of the petition, and the testimony at the disposition hearings concerned only truancy and not any delinquent acts. The mother never objected to the misstatement at the time it was made at the merits hearing, nor at any of the three disposition hearings which followed. Matters not raised at trial may not be presented for the first time on appeal. Plante v. Johnson, 152 Vt. 270, 272, 565 A.2d 1346, 1347 (1989); Garrow v. Garrow, 150 Vt. 426, 431, 553 A.2d 569, 572 (1988). That principle is especially apposite where numerous trial-level hearings followed the initial error, and no one moved to question the nature of the original order on the basis of this error. As we said in Meacham v. Kawasaki Motors Corp., 139 Vt. 44, 46-47, 421 A.2d 1299, 1301 (1980): "[A] litigant *969 cannot use as grounds for a new trial a problem which could have been cured at the time it arose."
The mother next contends that the guardian ad litem did not adequately carry out his responsibilities and that the court should not have received the views of D.B.'s guardian ad litem, which the court allowed to be presented without the opportunity for the mother to inquire about the guardian's credentials on cross-examination. A guardian ad litem is an officer of the court appointed to protect the interests of the child. In re L.A., 154 Vt. 147, 156, 574 A.2d 782, 787 (1990). Because the guardian ad litem is an officer of the court, it is primarily the court's responsibility to insure that the guardian ad litem actively protects and promotes the child's best interests. See id. (upholding admission of guardian ad litem's opinion in part because court found her qualified enough to appoint her); Whitcomb v. Dancer, 140 Vt. 580, 587, 443 A.2d 458, 461 (1982) (common law requires independent investigation and concurring decision by court before guardian ad litem can bind minor litigant to settlement agreement). The child does not have the power to waive the appointment of a guardian ad litem. In re Dobson, 125 Vt. 165, 169, 212 A.2d 620, 623 (1965). Nor must the guardian ad litem necessarily agree with the child's point of view. Rather, "[i]t is the guardian ad litem's duty to stand in the shoes of the child and to weigh the factors as the child would weigh them if his judgment were mature and he was not of tender years." J.W.F. v. Schoolcraft, 763 P.2d 1217, 1221 (Utah App.1988); see In re J.L.H., 647 S.W.2d 852, 861 (Mo. Ct.App.1983).
The mother urges that the guardian ad litem operated at cross purposes with D.B.'s attorney, who opposed transfer of custody of D.B. to SRS. As we pointed out in Dobson, the roles of attorney and guardian ad litem for a minor are separate in order to avoid the conflict that could result where "legal counsel is cast in the quandary of acting as both attorney and client." 125 Vt. at 168, 212 A.2d at 622. It is unfortunate that counsel and the guardian ad litem disagreed about the best interests of D.B. But there is no reason to conclude that the difference in views impugned the guardian's qualifications to serve. Nor is there any question that the guardian, acting as the client, is supposed to exercise independent judgment. See Orr v. Knowles, 215 Neb. 49, 53, 337 N.W.2d 699, 703 (1983) (duties and responsibilities of the guardian ad litem are not coextensive with those of an attorney); In re J.G., 144 Vt. 489, 490-91, 479 A.2d 153, 154 (1984) (to disqualify minor's guardian ad litem, it must be shown that the conflict between the minor and the guardian ad litem interfered with the minor's exercise of some constitutional right). In State in Interest of Orgill, 636 P.2d 1075, 1078 (Utah 1981), a mother whose parental rights had been terminated appealed inter alia from the trial judge's refusal to disqualify and remove the children's guardian ad litem. In affirming, the court stated that the guardian "is not required to remain neutral between the two positions taken by the parties.... The fact that [the guardian ad litem] now advocates that the best interests of the children would be served by the termination of the parental rights of the [mother] does not prove" the guardian acted improperly. Id.
The mother also argues that the guardian's views were testimony that was improperly received because it was unsworn. However, the mother failed to object to the court's receipt of the guardian's views at the time they were presented. Rather, the objection was raised well after the event had taken place. Failure to object at the time of presentation acts as waiver. State v. Bushey, 149 Vt. 378, 380, 543 A.2d 1327, 1328 (1988); State v. Byrne, 149 Vt. 257, 260-61, 542 A.2d 667, 669 (1988).
Finally, the mother argues that the court's rejection of protective supervision was based on speculation and conjecture because Dr. Belenky's testimony was not sufficiently definite. However, the court's rejection of this alternative was not based on the testimony of any one witness. Rather, it was based on the totality of the *970 evidence, which was more than sufficient to support the trial court's determination.
After lengthy pursuit of the protective supervision possibility through all three disposition hearings, no feasible plan providing for protective supervision was presented to the court. The evidence was overwhelming that D.B. would not be likely to attend school while living at home. The school principal testified that D.B. had attended school on only eight of ninety-four days while he was living at home. D.B.'s SRS case worker testified that she had been unsuccessful in her attempts to get D.B. to go to school while he was living at home. Dr. Belenky testified about attempts to place D.B. in a residential school without transferring custody to SRS, but his mother failed to complete the application, and the school advised Dr. Belenky that there was no longer a place for D.B. The only other potential arrangement which witnesses indicated might have worked was residential placement with a neighborhood family. But the family declined to become eligible for the placement.
Further, the mother's characterization of Dr. Belenky's testimony as indefinite misses the mark. The witness was clear that if D.B. was not removed from his family, the combination of family dysfunction and lack of education would likely result in "dangerous delinquency." He expressed the view that even if a foster setting could be arranged, because of the severity of D.B.'s problems, protective supervision would result in continued crises and would provide little ability to deal with the child's very considerable needs.
The mother characterizes statements by Dr. Belenky as full of doubt and based on guesses. But read as a whole, Dr. Belenky's lengthy testimony simply conveys that even the most carefully considered recommendations for so troubled a youngster living in a difficult and complex family setting may be imperfect. The trial court was not bound to withhold judgment until certainty presented itself. It was far better for the witness to advise the court of possible uncertainties in his opinions than to speak as if human behavior could be reduced to a mathematical formula. Dr. Belenky's recommendations were specific. The testimony of all the witnesses, taken cumulatively, provided an ample basis on which the court could properly conclude that custody of D.B. should be transferred to SRS.
Affirmed.
NOTES
[*] Under 33 V.S.A. § 632(a)(4) (current version at 33 V.S.A. § 5502(a)(4)) a delinquent child means a child who has committed a delinquent act. A delinquent act is defined in 33 V.S.A. § 632(a)(3) (current version at 33 V.S.A. § 5502(a)(3)) as "an act designated a crime under the laws of this state, or of another state if the act occurred in another state, or under federal law."