# Gail Bacon v. Clodomir Lascelles, et al.

[678 A.2d 902]

No. 95-080

Present: **Allen, C.J., Gibson,**[1] **Dooley, Morse and Johnson, JJ.**

Opinion Filed May 17, 1996

---

[1] Justice Gibson sat at oral argument but did not participate in this decision.

*Frank E. Talbott* of *Wilson Powell Lang & Faris*, Burlington, for Plaintiff-Appellant.

*Marc B. Heath* and *Carol L. Shea* of *Downs Rachlin & Martin, P.C.*, Burlington, for Defendant-Appellee Lascelles.

*Neil H. Mickenberg* of *Mickenberg, Dunn, Sirotkin & Dorsch*, for Defendant-Appellee Burlington Housing Authority.

**Allen, C.J.** Plaintiff Gail Bacon appeals from the grant of summary judgment for defendant Burlington Housing Authority (BHA) and from an adverse verdict and judgment in favor of defendant Lascelles in an action for the wrongful death of her son. We affirm.

On August 6, 1990, the decedent died during a fire in a two-story apartment owned by defendant Lascelles. Plaintiff sued defendant Lascelles claiming he negligently built and maintained the apartment. She alleged that the decedent could not escape the apartment because a second floor bedroom window did not open sufficiently in violation of applicable safety codes.

Plaintiff also sued the BHA claiming it failed to properly inspect the apartment. At the time of the fire, decedent was a guest of the apartment's tenants. The tenants participated in the Section 8 housing program, which is a federal rent subsidy program implemented nationally by the United States Department of Housing and Urban Development (HUD) and administered locally by the BHA. By agreement with HUD,[2] the BHA is required to inspect rental housing for compliance with the Federal Housing Quality Standards (HQS) prior to occupancy by recipients of federal rent subsidies.

On December 8, 1989, the BHA inspected defendant Lascelles's apartment for compliance with the HQS.[3] The inspector informed defendant Lascelles and the tenants of the results of the inspection, and both parties signed the Dwelling Inspection Checklist. Under the category "Fire Exits" on the Dwelling Inspection Checklist, the BHA

---

[2] The agreement between HUD and the BHA is recorded in the Annual Contribution Contract. HUD enters into these contracts with all public housing authorities which administer the Section 8 program.

[3] The tenants already occupied the apartment when they applied for Section 8 assistance.

inspector checked "YES PASS." This conclusion was based on the fact that the first floor of the apartment had two doors leading outside, one to the driveway and another to a back deck. The inspector could not recall if she inspected the second floor bedroom windows, but her standard practice was to determine if the second floor windows opened but not to measure the window opening.

On October 27, 1993, the BHA filed a motion for summary judgment arguing that it owed decedent no duty of reasonable care. The trial court denied the motion concluding that the BHA "owed [decedent] a duty to act reasonably in inspecting the Section 8 premises."[4] The court went on to say:

> It need not assure, unlike the owner of the premises, that the unit meets every safety condition existing at law. BHA has only assumed a duty to inspect for the acceptability criteria in the federal regulations. In this case, the building needed to contain an alternate means of egress in case of fire.

On October 20, 1994, the BHA filed a second motion for summary judgment arguing that it did not breach its duty to the decedent. On January 5, 1995, the trial court granted summary judgment for the BHA concluding that "it did not breach its duty but acted reasonably in its inspection of this Section 8 premises and in determining that the building met the acceptability criteria outlined by the federal regulations." In support of this conclusion, the trial court deferred to the BHA's interpretation of the HQS because it was responsible for their implementation.

On pretrial motions, the court concluded that defendant Lascelles maintained the apartment in violation of the 1989 Vermont Fire Prevention and Building Code. Consequently, the court allowed defendant Lascelles to offer evidence of prior inspections to rebut the presumption of negligence created by this finding. Defendant offered evidence of the December 1989 BHA inspection, a June 1990 BHA

---

[4]The BHA does not appeal the court's decision that it owed a duty of reasonable care to Section 8 tenants but does appeal the court's decision that it owed a duty of reasonable care to the decedent, a guest of Section 8 tenants. See *Corbin v. Buchanan*, 163 Vt. 141, 143, 657 A.2d 170, 172 (1994) (town owes no duty of care based on ordinance whose purpose was to protect general public). In light of our disposition, we need not consider the BHA's argument on this issue.

inspection,[5] and a July 1988 Burlington Minimum Housing Standards inspection. The jury returned a verdict for the defendant, and plaintiff appealed.

## I.

Plaintiff first argues that the trial court erred in granting the defendant BHA's motion for summary judgment and that the court erred when it deferred to the BHA's interpretation of the HQS. We conclude that, while the trial court should not have deferred to the BHA's interpretation of the HUD regulations, summary judgment was proper.

■ We review a motion for summary judgment under the same standard as the trial court: summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Cavanaugh v. Abbott Laboratories*, 145 Vt. 516, 520, 496 A.2d 154, 157 (1985); V.R.C.P. 56(c). In making this determination, we regard as true all allegations of the nonmoving party that are supported by admissible evidence, and we also give the nonmoving party the benefit of all reasonable doubts and inferences. *Messier v. Metropolitan Life Ins. Co.*, 154 Vt. 406, 409, 578 A.2d 98, 99-100 (1990). Here, neither the BHA nor plaintiff dispute the relevant facts about the features of the apartment and the nature of BHA's inspection of the apartment. The proper interpretation of the HQS and whether BHA's inspection complied with the HQS are issues of law that must be determined on BHA's motion for summary judgment.

■ The trial court deferred to the BHA's interpretation of the HQS, citing *Rogers v. Watson*, 156 Vt. 483, 489, 594 A.2d 409, 412 (1991) ("[A]bsent compelling indications of error we must accept the interpretation of administrative regulations by the agency responsible for their implementation."). Plaintiff argues that the BHA's interpretation should be given no deference because HUD, not the BHA, promulgated the regulation. We agree.

The policy justifications for the deference rule — such as agency expertise, familiarity with purpose of the regulation, and the express delegation of legislative authority to promulgate regulations — are

---

[5] When defendant Lascelles sought to evict the tenants because they had allegedly damaged the apartment, the BHA inspected the apartment again.

lacking when the agency is not interpreting its own regulation. R. Weaver, *Judicial Interpretation of Administrative Regulations: The Deference Rule*, 45 U. Pitt. L. Rev. 587, 609-10 (1984); 1 K. Davis & R. Pierce, Administrative Law Treatise § 6.10, at 282 (1994). Giving deference to the BHA is also contrary to federal administrative law. *Tsosie v. Califano*, 651 F.2d 719, 722 (10th Cir. 1981) ("The Secretary's construction is not entitled to special deference to the extent it rests on the interpretation of another agency's statutes and regulations."); accord *Whaley v. Schweiker*, 663 F.2d 871, 873 (9th Cir. 1981).

The Section 8 program requires the BHA to conduct inspections to determine whether participating rental housing complies with the access acceptability criteria in the HQS, found at 24 C.F.R. § 882.109(j) (1994). The access acceptability criterion requires that "[t]he *building* shall provide an alternate means of egress in case of fire (such as fire stairs or egress through windows)." *Id.* (emphasis added). Plaintiff argues that "means of egress" is defined by other safety codes as "a continuous and unobstructed way of exit travel *from any point in a building* or structure to a public way." National Fire Protection Assoc., *Life Safety Code Handbook* § 5-1.2.1, at 40 (J. Lathrop ed., 4th ed. 1988) (emphasis added); Building Officials & Code Administrators Int'l, Inc., *The BOCA National Building Code*, Definitions, at 33 (10th ed. 1987). Plaintiff argues for this interpretation so that she can further argue that the stairwell between the first and second floors of the apartment, combined with any exit on the first floor of the apartment, constituted one means of egress but that the second floor of the apartment lacked an alternative means of egress such as through a window.

The plain language of the HQS is contrary to plaintiff's interpretation. First, the access acceptability criterion reads "building," not "from any point in a building." Second, the access acceptability criterion does not require windows or prescribe the dimensions of window openings but merely mentions windows as an example of a means of egress. Third, the HQS contain window requirements only in the acceptability criteria for illumination and air quality. See 24 C.F.R. §§ 882.109(e)(2) (illumination: sleeping rooms shall include at least one window), 882.109(g)(2) (air quality: bathroom areas shall have at least one window that opens or other adequate exhaust ventilation).

██ The *Housing Inspection Manual*, the *Public Housing Agency Administrative Practices Handbook for the Section 8 Existing Housing Program*, and the pamphlet *A Good Place to Live!*, all

published by HUD, provide additional information on the meaning of the HQS.

The *Housing Inspection Manual* states that an acceptable fire exit "means that the building must have an alternate means of egress that meets local or state requirements." Office of Housing, U.S. Dept. of Housing and Urban Development, *Housing Inspection Manual* § 8.2, at 119 (March 1985). Thus, HUD intended that public housing agencies such as the BHA would rely on local codes when determining the adequacy of emergency exits in Section 8 rental housing.

Plaintiff argues that the Life Safety and BOCA Codes are the applicable local codes. The Life Safety Code was not adopted until the 1992 Burlington City Ordinance and was therefore not applicable when the fire occurred in August 1990. Burlington, VT., *Building & Building Construction* ch. 8, art. I, § 8.2(a) (1992). The 1981 BOCA Code, however, had been adopted by reference in the 1983 City of Burlington Ordinance. Burlington, VT., *Building & Building Construction* ch. 8, art. I, § 8.2(a) (1983). The 1981 BOCA Code required that sleeping rooms below the fourth floor have an emergency egress and that windows have minimum opening dimensions. Building Officials & Code Administrators Int'l, Inc., *The BOCA National Building Code* § 809.4, at 156 (8th ed. 1981).

The BHA argues that the Burlington Minimum Housing Standards, not the BOCA Code, is the applicable local code. It also argues that, because the Minimum Housing Standards require only one means of egress from first and second-floor dwelling units, the Minimum Housing Standards are less stringent than the HQS. Burlington, VT., *Housing* ch. 18, art. I, div. 5, § 18-95 (1992).

A conflict exists in the 1983 Burlington Ordinance: the Ordinance adopts the BOCA Code, which required that second-floor bedrooms have an emergency egress, but the Ordinance's Minimum Housing Standards required only one means of egress from the entire dwelling unit. The Ordinance's conflict provision states that where the BOCA Code provisions, which were adopted by reference, conflict with the express provisions of the Ordinance, the express provisions control. Burlington, VT., *Building & Building Construction* ch. 8, art. I, § 8.2(b) (1992). Therefore, the Minimum Housing Standards control. The plain language of the HUD regulation, which requires two

means of egress from the building, is not modified by the local code, which only requires one means of egress from the dwelling unit.[6]

The *Administrative Practices Handbook* states that the public housing agency must determine whether the alternative means of access is "considered adequate by the appropriate local officials." Federal Housing Comm'r, U.S. Dept. of Housing and Urban Development, *Public Housing Agency Administrative Practices Handbook for the Section 8 Existing Housing Program* ¶ 5-4(10)(b), at 5-13 (Nov. 1979). The BHA presented uncontroverted evidence that the "appropriate local official" is the Burlington Minimum Housing Standards inspector, who inspects for compliance with the Burlington Minimum Housing Standards. Under those Minimum Housing Standards, one means of egress is considered adequate. Therefore, the plain language of the HQS, requiring two means of egress from the building, is not modified by what is "considered adequate by the appropriate local official."

The pamphlet *A Good Place to Live!* is designed to assist Section 8 tenants to "understand what the Section 8 Existing Housing Quality Standards [HQS] are and why they are important to you." Office of Housing, U.S. Dept. of Housing and Urban Development, *A Good Place to Live!* 1 (December 1989). The pamphlet accomplishes this through "picture[s] and explanation[s] of the items that the unit MUST HAVE." *Id.* at 3. The apartment pictured in the pamphlet is similar to the apartment at issue in this case — a two-floor unit with kitchen and living rooms on the first floor and bedrooms on the second floor. Under the section entitled "Other Rooms," which includes bedrooms, the pamphlet describes the window requirements — "At least one window in every room used for sleeping. . . . At least one window must open if it was designed to be openable [sic]." *Id.* at 10-11. The section lacks any requirements for the opening dimensions of bedroom windows. Under the section entitled "Health and Safety," the pamphlet states: "FIRE EXITS: At least two exits from the building in case of a fire. This requirement can be met by a window that opens if the unit is on the first or second floor." *Id.* at 14-15. Again, HUD used the word "building" rather than "from any point in the building." Moreover, the picture included in the "Health and Safety" section shows as adequate two doors at opposite ends of a hallway on the first floor of the two-floor apartment. As with the

---

[6]The building and dwelling unit are coextensive in this case.

apartment depicted in the pamphlet, the two-floor apartment here had two doors leading outside from the first floor.

Because the apartment complied with the HQS, the BHA did not breach its duty to act reasonably in inspecting the apartment. Therefore, summary judgment for the BHA was proper.

## II.

Next, plaintiff argues that the trial court gave an erroneous jury instruction on the prima facie case of negligence rule. The court instructed the jury that "a violation [of a safety code] may constitute negligence. However, if the defendant present[ed] evidence that he acted as a reasonably careful landlord would have acted in similar circumstances, you may find that he was not negligent." We do not reach plaintiff's argument regarding the jury instructions because plaintiff failed to object on this ground after the court charged the jury. *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 138, 636 A.2d 744, 750 (1993) (post-charge objection must be made to preserve issue for appeal).

Plaintiff also argues that the trial court erred by admitting evidence of prior inspections by the City of Burlington and the BHA. Plaintiff contends that these inspections were irrelevant and therefore inadmissible. We disagree.

At the motions hearing considering plaintiff's motion in limine, plaintiff represented to the court that the prima facie case of negligence rule controlled.[7] Under that rule, proof of the violation of a safety statute creates a prima facie case of negligence. *Larmay v. VanEtten*, 129 Vt. 368, 371, 278 A.2d 736, 738 (1971). A prima facie case raises a rebuttable presumption of negligence and shifts the burden of production to the party against whom the presumption operates. *Id.* at 371, 278 A.2d at 738-39; V.R.E. 301(a). When that party produces "evidence . . . fairly and reasonably tending to show

---

[7] Plaintiff's attorney said: "I will represent for Your Honor's instruction that . . . under the code these are the requirements, these are the standards, and if you find that the house violated these standards then you can find there is — that this is a presumption of negligence."

Later at the motions hearing, the following colloquy occurred:

THE COURT: . . . Basically, what I am saying [to the jury] is there is . . . a presumption but the presumption may be rebutted by evidence to the contrary.

[PLAINTIFF'S ATTORNEY]: Right. Pretty much the standard instruction . . . .

that the real fact [is] not as presumed," the presumption disappears. *Larmay*, 129 Vt. at 371, 278 A.2d at 739; V.R.E. 301(a).

Here, the trial court informed the parties that it planned to instruct the jury that defendant maintained the apartment in violation of the 1989 Vermont Fire Prevention and Building Code. Defendant therefore had the burden to present evidence rebutting the presumption of negligence created by this violation. Evidence of past inspections, and of defendant's reasonable reliance on those inspections to apprise him of safety code violations, would "fairly and reasonably tend[] to show" that the defendant acted as a reasonably prudent landlord under the circumstances. *Larmay*, 129 Vt. at 371, 278 A.2d at 739; see also V.R.E. 401 (relevant evidence tends to make existence of consequential fact more or less probable than without evidence). Because evidence of past inspections was relevant under the prima facie case of negligence rule, the trial court did not err when it admitted that evidence.

Plaintiff also argues that the inspections should have been excluded as unfairly prejudicial under V.R.E. 403. Plaintiff, however, did not invoke Rule 403 at trial. Plaintiff merely claimed that the inspections were prejudicial but failed to argue that the prejudice substantially outweighed the probative value, the standard in Rule 403. See *Carter v. Hewitt*, 617 F.2d 961, 966 n.4 (3d Cir. 1980) ("[A] party must specifically request the trial court to determine whether probative value is 'substantially outweighed by the danger of unfair prejudice,' before the court is required to invoke the rule."); *State v. Hogervorst*, 566 P.2d 828, 836 (N.M. Ct. App. 1977) ("Defendant's claim that the evidence was prejudicial did not alert the trial court to a question concerning Evidence Rule 403. The fact that competent evidence may tend to prejudice defendant is not grounds for exclusion of that evidence."). Moreover, any potential prejudice to plaintiff was mitigated by the court's jury instruction, which informed the jury that the prior inspections did not relieve defendant from his responsibility for complying with the 1989 Vermont Fire Prevention and Building Code.

## III.

Plaintiff next argues that the trial court erred when it excluded the testimony of plaintiff's rebuttal witness as a discovery sanction. The court excluded the witness's testimony because the plaintiff failed to supplement discovery under Rule 26(e). "[A] trial

court has inherent authority to enforce V.R.C.P. 26(e) by excluding evidence, granting a continuance, or by taking other appropriate action." *White Current Corp. v. Vermont Elec. Coop.*, 158 Vt. 216, 223, 609 A.2d 222, 226 (1992). A trial court's sanctions for Rule 26(e) violations will be upheld unless it either totally withholds its discretion or exercises it on clearly untenable or unreasonable grounds. *Id.* The trial court did not abuse its discretion here.

When, on the last day of trial, the court noted that plaintiff planned to call a former tenant as a rebuttal witness, defendant Lascelles objected on the basis of unfair surprise. Plaintiff argued that not until the previous day did he consider calling the witness to testify and that her testimony was offered to rebut the testimony of defendant Lascelles given the previous day. Defendant Lascelles argued that the substance of his trial testimony was no different from his deposition testimony and that the plaintiff therefore knew of the need for rebuttal testimony in advance of trial. The trial court decided to allow the witness to testify, but offered defendant Lascelles an opportunity to question her first. After questioning the witness, defendant Lascelles continued to object on the basis of unfair surprise. The trial court then inquired into the course of discovery.

Defendant's interrogatories asked: "Do you have any information which indicates that decedent or any other person complained to Mr. Lascelles about the problems with the Jarvis apartment?" Plaintiff responded "No." Although it is not clear from the record whether plaintiff learned of the witness's identity before or after responding to the defendant's interrogatories, plaintiff did contact the witness four years before trial. Notwithstanding plaintiff's contact with the witness long before trial, plaintiff never provided supplemental information as to "the identity and location of persons having knowledge of discoverable matters." V.R.C.P. 26(e)(1)(A). Because plaintiff failed to supplement discovery, defendant was unaware that the witness would be called to testify until the last day of trial. The defendant therefore had no opportunity to depose or investigate the witness in preparation for cross-examination. Moreover, plaintiff called the witness to testify about a crucial fact, whether the window opened and whether defendant Lascelles knew that the window did not open.

After exploring the course of discovery, the court excluded the witness from testifying, saying "I find it just a little disingenuous to claim that it was only yesterday that [plaintiff] thought of calling her as a witness when, in fact, she had extremely relevant information all along, information that was known to the plaintiff for at least a

number of years." Under these circumstances, the trial court did not abuse its discretion when, as a discovery sanction, it excluded the witness from testifying.[8]

*Affirmed.*

---

[8] Plaintiff also argues that the trial court erred by ruling that she is not "next-of-kin" under the Wrongful Death Act, 14 V.S.A. § 1491, and erred in its jury instruction regarding the decedent's contributory negligence. Even if the court did err, plaintiff suffered no prejudice because, having found defendant Lascelles not negligent, the jury never reached the damages issue. V.R.C.P. 61; see *Bloomer v. Weber*, 149 Vt. 187, 190, 542 A.2d 258, 260 (1988) (reversal is required only where error complained of results in undue prejudice).

Finally, plaintiff argues that the trial court erred when it allowed evidence of a subsequent relationship by the decedent's daughter's mother and when it excluded evidence of defendant Lascelles's subsequent modifications to the apartment window. We do not address either of these arguments because they were not preserved below. *In re D.B.*, 155 Vt. 580, 584, 587 A.2d 966, 968 (1991) (failure to preserve issues below precludes review on appeal).