Smith v. Central Vermont Hospital, Inc., No. 306-6-01 Wncv (Teachout, J., July 30, 2003)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
WASHINGTON COUNTY, SS.

SUSAN C. SMITH, Administratrix of the )
Estate of SHAUN M. SMITH,                )
  Plaintiff,                            )
              )  **Washington Superior Court**
v.                                       )  **Docket No. 306-6-01 Wncv**
              )
CENTRAL VERMONT HOSPITAL, INC.,          )
CENTRAL VERMONT MEDICAL                   )
CENTER, INC., and                        )
GARY H. GOLDBERG, MD,                     )
  Defendants.                          )

### Memorandum of Decision
### Defendants' Motion for Summary Judgment, filed December 2, 2002

In this medical malpractice case, Plaintiff is represented by Ronald A. Fox, Esq. Central Vermont Hospital, Inc., Central Vermont Medical Center, Inc., and Gary H. Goldberg, MD (collectively, Defendants) are represented by Ritchie E. Berger, Esq. Oral argument on the Motion for Summary Judgment was heard on April 28, 2003.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. See V.R.C.P. 56(c)(3). "A summary judgment motion is intended to 'smoke out' the facts so that the judge can decide if anything remains to be tried." Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972) (citations omitted). Summary judgment procedure is properly regarded as "an integral part of the rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Morrisseau v. Fayette, 164 Vt. 358, 363 (1995) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)).

Plaintiff is the Administratrix of the Estate of her son, Shaun M. Smith, who was injured in a bicycle accident on July 1, 1999. The Barre Town EMS arrived at the scene to find Shaun, age 18, sitting on the side of the road. Shaun complained of back and mouth pain. On arrival at the emergency room of Central Vermont Hospital (CVH), Shaun was examined by Defendant

Dr. Goldberg. Dr. Goldberg did not at that time contact available specialists, such as a general surgeon and anesthesiologist, to assist with Shaun's care. Shortly after arriving, Shaun became assaultive and dangerous. He was placed in restraints, and was later given anti-anxiety medication. An hour and a half after arriving at CVH, Shaun was sent to x-ray. He was returned from x-ray with difficulty breathing. After several attempts to intubate Shaun (insertion of a tube to provide breathing assistance), he was successfully intubated. By then, however, he had aspirated enough blood into his lungs that he became unable to breath despite the intubation. He died shortly thereafter.

In a medical malpractice case, the plaintiff has the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by a reasonably skillful, careful, and prudent health care professional engaged in a similar practice under the same or similar circumstances whether or not within the state of Vermont.

(2) That the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

12 V.S.A. § 1908. Normally, a plaintiff's burden of proving these elements is "satisfied only by expert testimony." Larson v. Candlish, 144 Vt. 499, 502 (1984), quoted in Deyo v. Kinley, 152 Vt. 196, 204 (1989). "This rule has been adopted because normally a complicated medical procedure, not easily evaluated by a lay person, is at issue." Deyo, 152 Vt. at 204. However, "whether the plaintiff has met the burden of proof sufficient to send the case to the jury is a matter of law for the court to decide." Id. (citing Utzler v. Medical Center Hospital, 149 Vt. 126, 128-29 (1987)).

Defendants claim that Plaintiff, after a reasonable and sufficient time to obtain expert opinions to support the elements of the cause of action, is unable to prove the claim with the requisite expert testimony, and that Defendants are therefore entitled to judgment.

This is Defendants' second motion for summary judgment on this issue. Plaintiff's expert witness disclosures were initially due by January 1, 2002. On February 8, 2002, Defendants moved for summary judgment on the grounds that Plaintiff had not provided disclosures of expert opinions, and could therefore not prove the case. On May 23, 2002, Judge Cheever denied the motion, and a new Discovery Schedule was established, which provided in Paragraph 4 as follows: "Plaintiff shall disclose all V.R.C.P. 26(b)(4)(A) experts by 6/6/02 and shall thereafter be precluded from disclosing any experts. Plaintiff experts' depositions shall be completed within 30 days of disclosure." Order entered May 31, 2002.

On June 6, 2002, Plaintiff disclosed as her expert Andrew Sumner, M.D., who has a specialty, like Dr. Goldberg, in emergency medicine. Dr. Sumner was deposed on September 12, 2002. Although he initially stated his opinion that Dr. Goldberg deviated from the standard of care by failing to call trauma specialists (specifically, a surgeon and an anesthesiologist),[1] he also testified on two occasions to opinions implying that Dr. Goldberg himself should have made the decision to intubate Shaun.[2] In making these statements, it appears he was assuming that trauma specialists would have concurred. Upon further questioning during the deposition, he clarified his opinion, stating clearly that the deviation from the standard of care was the failure to consult with trauma specialists. He also gave the opinion that the delay in consulting with the trauma specialists caused Shaun's premature death, again apparently assuming that trauma specialists would support immediate intubation under the circumstances. As summarized by Plaintiff's counsel in the Statement of Undisputed Facts at paragraphs 16-17:

16.     J. Andrew Sumner, MD, the expert for Plaintiff holds the opinion that Goldberg deviated from a standard of care by failing to involve a surgeon and anesthesiologist to evaluate Shaun upon his arrival at CVH.

[1]"So here's a person who comes in who's got a head injury, he's been unconscious, can't remember it, he can't follow commands, he's agitated, he requires restraints, physical and chemical restraints. So this is the kind of case where Dr. Goldberg should have called for help immediately from others. Should have called anesthesia, he should have called a surgeon on call. They should have all come and helped him assess this patient and decide how to manage him." Deposition Transcript of Dr. Sumner, page 32.

[2]"So what I'm saying the standard is, is you–here's this kid, he hits a door, he's wild, he's agitated, he's got a head injury, you call anesthesia in, surgery, you intubate this kid right then and there." Deposition Transcript of Dr. Sumner, page 50-51. "Well, that's . . . what I say the standard is. He's got a moderate head injury, he should have had rapid sequence intubation." Deposition Transcript of Dr. Sumner, page 52.

3

17.     Goldberg ultimately consulted with an anesthesiologist and a surgeon; however, in Dr. Sumner's opinion this was "Too little, too late.

During the deposition he was asked about his opinion if an anesthesiologist had been consulted and had not recommended any different course of action than the one that Dr. Goldberg followed:

Dr. S:  Then I would not be critical of him.

Atty:   And similarly, you don't know that if Dr. Goldberg had consulted a general surgeon on the patient's arrival at Central Vermont Hospital the course of action and care and outcome would have been any different?

Dr. S:  That's right.

Atty:   You just think it would have provided him legal protection effectively in the event of a suit such as this?

Dr. S:  It would have, and I think they would have elected to have been much more aggressive about managing the patient initially.

Atty:   They well may not have been?

Dr. S:  That's right, but then I wouldn't be critical of him.  If they had–if the emergency physician, the anesthesiologist and the surgeon all got there, they looked at this kid and they said, let's–here's what we want to do, exactly what Dr. Goldberg did, then I would–you know, would probably not be sitting here.

Deposition Transcript of Dr. Sumner, pages 55-56. Later in the deposition, Dr. Sumner stated, upon specific questioning, that he had provided all his opinions and conclusions related to the case, and that he did not need to review any more materials.  Deposition Transcript of Dr. Sumner, pages 71, 74-75. He further stated that if any opinions changed, he would let Plaintiff's attorney know.  Deposition Transcript of Dr. Sumner, page 80.

Thus, in the disclosure and deposition, Dr. Sumner presented two opinions clearly and a third less clearly. First, he was very clear that the standard of care was that Dr. Goldberg should have called trauma specialists, and that the failure to do so was a deviation from the standard of care.  His second and related opinion was that the delay caused by the initial failure to involve trauma specialists caused premature death.  In the course of the deposition, he also appeared to state a related opinion that Shaun should have been intubated "then and there," apparently confidently basing his opinion on an assumption that trauma specialists would have been "aggressive about managing the patient initially."  Thus, he expressed less clearly a third opinion

4

that the standard of care called for immediate intubation, and that Dr. Goldberg deviated from the standard of care by failing to do it. He therefore gave unqualified opinions as to the first two elements of a medical malpractice claim: standard of care and deviation. His opinion as to causation was a conditional one, in which he deferred to the opinions on trauma specialists. In fact, his answer is quite clear that if the trauma specialists had recommended the same course of action that Dr. Goldberg followed, then he would not be critical of Dr. Goldberg, and there would be no case. The significance of that testimony is that it expresses Dr. Sumner's opinion that neither the failure to consult trauma specialists nor the failure to intubate could have caused Shaun "injuries that would not otherwise have been incurred,"if trauma specialists would have done the same thing.

In their Motion for Summary Judgment, Defendants argued that Plaintiff could not support her burden under 12 V.S.A. § 1908 to prove causation, because Plaintiff could not prove that trauma specialists would have advised Dr. Goldberg to do other than what in fact he did. Defendants filed, with their Motion, affidavits of General Surgeon Michael Mason, M.D.; Ear, Nose and Throat Surgeon Paula Pyle, M.D.; and Anesthesiologist Nine Sharp, M.D., the specialists actually available when Shaun was admitted, who stated that they would not have recommended intubation. Therefore, according to Defendants, if there was a deviation, as Dr. Sumner opined, it did not proximately cause "injuries which would not otherwise have occurred." 12 V.S.A. § 1908(3).

In response to the Motion, Plaintiff submitted an affidavit of Dr. Sumner, dated December 27, 2002, which was after the filing of the Defendants' Summary Judgment Motion. In the affidavit, Dr. Sumner states: "It is my opinion that Dr. Goldberg should have initiated RSI [rapid sequence intubation] shortly after Shaun's arrival at CVH. It is my opinion to a reasonable degree of medical certainty that Dr. Goldberg's failure to initiate RSI at that time proximately resulted in Shaun Smith's death." Affidavit of J. Andrew Sumner, M.D. para. 5. Dr. Sumner also states that "if Shaun had been intubated promptly upon his return to the emergency department [from x-ray] he would have survived." Id. para. 10.

Defendants have responded that in this affidavit, Dr. Sumner sets out new theories of liability which should be excluded as untimely, while Plaintiff argues that the affidavit meshes with and clarifies deposition testimony and, in any event, was not submitted in bad faith. In the new affidavit, Dr. Sumner no longer opines that the deviation was the failure to consult with trauma specialists. Rather, he sets forth four opinions that may be summarized as follows:

(1) that Dr. Goldberg's failure to initiate rapid sequence intubation shortly after Shaun's arrival at the hospital constituted a deviation from the correct standard of care;

(2) that such failure proximately caused Shaun's death, for if he had been intubated promptly, he would have survived;

5

(3) that Dr. Goldberg's failure to call for assistance upon Shaun's return to the ER from x-ray constituted a deviation from the correct standard of care; and

(4) that such failure proximately resulted in Shaun's premature death.

Of these, the first was expressed initially by Dr. Sumner during his deposition; however, upon questioning he clarified that his opinion was that the deviation was the failure to involve trauma specialists, rather than the failure to intubate regardless of what trauma specialists would have advised. Although it could thus be said that (1) was not a "new" opinion, his return to it after the completion of the deposition and filing of the Motion was new as it was a shift in his position from the one he expressed at the conclusion of his deposition to one buried within it, and apparently abandoned during deposition testimony. As to (2), (3), and (4), these are new opinions, not previously disclosed at any time, either by the extended deadline of 6/6/02, or during the deposition testimony, or at any time prior to being given in Plaintiff's 12/30/02 response to Defendants' second Motion for Summary Judgment filed on 12/2/02.

Rule 37 concerning sanctions for discovery failures provides as follows:

A party that without substantial justification fails to disclose information required by Rule 26(e) is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

V.R.C.P. 37(c)(1). The federal version of this rule is nearly identical.

This sanction, designed to "put teeth into" disclosure requirements, is "automatic" and "applies not only at trial, but also with respect to any motion, such as a motion for summary judgment, or at a hearing. It applies not only to witnesses, but also to any 'information' not disclosed, although it does not apply to evidence offered solely for impeachment." 8A Wright and Miller, Federal Practice and Procedure § 2289.1 at 704. Exclusion should not apply, however, where the failure to disclose is substantially justified or harmless. Id. § 2289.1 at 705. The Vermont Supreme Court upheld exclusions of untimely disclosures even before the 2002 amendments to Rule 37(c)(1) that paralleled the federal rule and specified exclusion as a sanction for disclosure failures. White Current Corp. v. Vermont Electric Cooperative, 158 Vt. 216, 223 (1992); Bacon v. Lascelles, 165 Vt. 214 (1996); Greene v. Bell, 171 Vt. 280 (2000); Hutchins v. Fletcher Allen Health Care, 172 Vt. 580 (2001) .

6

In this case, the issue of whether or not to exclude Dr. Sumner's new opinions is critical to the outcome: if his new opinions are excluded, Plaintiff cannot prove the essential element of causation, and the Defendants are entitled to judgment as a matter of law. Permitting the opinions to be used would be to relax, for the second time in the case, a key discovery deadline in order to give Plaintiff another untimely chance to support her case.

Rule 37(c)(1) specifies in clear language that a party who fails to supplement discovery responses "is not . . .permitted" to use the non-disclosed material unless the failure is "harmless," or there is "substantial justification." The Fourth Circuit recently addressed the issue presented by this case in relation to the parallel federal rule, and decided that in determining whether untimely disclosures were harmless or substantially justified, a trial court should consider the following factors:

> (1) surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003) (affirming exclusion of expert opinion newly formed immediately before trial).

Applying those factors in this case demonstrates that Defendants had already completed their deposition of Dr. Sumner in which they fully explored the substance and limitations of his opinions. They did not learn of the new opinions until after the deposition, and after the effort and expense of preparing the Motion for Summary Judgment. Allowing the new opinions to be used would result in extensive delay in the resolution of the case, and in significant additional expense to Defendants, as Defendants will be prejudiced unless they have a new opportunity to depose Dr. Sumner to explore the bases for his new and changed opinions.

The opinions do not relate to matters that are tangential or corroborative; on the contrary, they provide the only evidence on the key elements of the case, and are thus central to whether a cause of action exists. Accordingly, they are the evidence that should receive the most focus and attention, such that supplements to change any disclosures are of the highest priority. There is no reasonable explanation for the change in the opinions. Dr. Sumner testified at his deposition that he did not need to see any more material, and that his opinions represented all his opinions and conclusions on the case. He did not review any new or previously unreviewed material between the time of his deposition and his new affidavit, except possibly the Defendants' Motion for Summary Judgment and attachments.

In sum, the failure to provide disclosures of these new opinions until the last minute cannot be viewed as harmless. Duplication of expense on Defendants' part, as well as unconscionable delay, would be the result. Less tangible, but equally serious, would be an erosion in the confidence of litigants that the courts are capable of promoting just and efficient

7

resolution of cases. There does not appear to be any justification at all, much less a substantial one. The lack of any justification leaves the unavoidable impression that the new opinions arose in reaction to the expression of the theory of defense in Defendants' Motion for Summary Judgment.

Plaintiff argues that the opinions should not be excluded because there has been no showing of bad faith. Though bad faith is a factor in some circuits, "excluding evidence only when the nondisclosing party acted in bad faith would undermine the basic purpose of Rule 37(c)(1): preventing surprise and prejudice to the opposing party." Southern States, 318 F.3d at 596. Requiring a showing of "bad faith would improperly shift the burden away from" the nondisclosing party. Id. There does not appear to be a solid policy justification for adopting a "bad faith" requirement, and the rule itself does not include one.

Faced with Plaintiff's effort to use new and untimely opinions, the court has three choices:

(1) The first is to deny the Motion for Summary Judgment. This would entail reopening and extending the discovery schedule again to give Defendants another opportunity to depose Dr. Sumner, as denying them that opportunity would prejudice Defendants in their preparation for trial. This already happened once, and to repeat the process would add a full year to the length of the case as well as impose on the Defendants considerable additional expense as well as the burden of living with ongoing unresolved claims. This would be significant harm without substantial justification.

(2) A variation would be to deny the Motion for Summary Judgment, and permit the Plaintiff to use the new evidence only if Plaintiff absorbs all of the financial costs of the previously completed attorney work that would have to be duplicated (conducting a new deposition) or became wasted effort (preparing the Motion). The lack of substantial justification makes this unwarranted, and it still would not relieve the harm of delay, including nonfinancial costs to the Defendants, and the impact on other cases resulting from the failure of the court to enforce the rules of the discovery process.

(3) The final choice is to exclude the new opinions as untimely and therefore unusable under Rule 37(c)(1). This is the only course that is consistent with the terms and purpose of the rule, and it is not unfair to Plaintiff in this case, as Plaintiff already had one extension of time in order to obtain and disclose an expert whose opinions would support her case. In addition, her witness had a full and fair opportunity to examine all the documents and materials he felt he needed before forming his opinions. The need of parties and attorneys to rely on the fair and efficient enforcement of the discovery rules is an important policy consideration, and can only be furthered by observance of the rule, which excludes the new opinions unless the violation was harmless or there is a substantial justification, neither of which have been shown. Thus, this is the only fair choice.

To summarize, the deviation alleged by Plaintiff is that Dr. Goldberg failed upon initially examining Shaun to immediately involve trauma specialists in Shaun's care. According to Plaintiff, when Dr. Goldberg did consult the specialists, it was too late, and Dr. Goldberg's failure to consult proximately resulted in Shaun's death. Defendants claim that if, as Plaintiff urges, Dr. Goldberg had consulted the available specialists shortly after Shaun arrived at the hospital, those specialists would not have advised a course of action different than the one in fact pursued by Dr. Goldberg. Plaintiff argues that the Defendants' trauma specialists, whose affidavits were submitted and who were deposed, gave inconsistent factual testimony, and that therefore there are disputes of fact. That argument does not address the central issue of whether the Plaintiff has expert testimony on each of the elements of a medical malpractice cause of action sufficient to support a jury verdict.

It is Plaintiff who has the burden of proving causation. Plaintiff has offered no expert opinion that specialists would have recommended earlier intubation, and earlier intubation would have prevented Shaun's death. Such opinion testimony is needed as evidence that Dr. Goldberg's failure to consult with trauma specialists proximately caused injuries that would not otherwise have occurred. There is simply a failure of proof on one of the essential elements of the claim. The record includes no expert testimony supporting causation under 12 V.S.A. § 1908(3). Plaintiff therefore has not made a showing under 12 V.S.A. § 1908 sufficient to support a claim of liability on the part of Dr. Goldberg.

Liability on the part of Defendants Central Vermont Hospital, Inc. and Central Vermont Medical Center, Inc. would either be imputed from liability on the part of Dr. Goldberg, or be based on independent expert testimony of a deviation from the standard of care by other medical personnel. Because there is a lack of evidence to support a claim on either basis, all Defendants are entitled to judgment as a matter of law.

## Order

For the foregoing reasons, Defendants' Motion for Summary Judgment is *granted*.

Dated at Montpelier, Vermont this ____ day of July, 2003.

_____

Mary Miles Teachout
Superior Court Judge